1  **Noreen Rucinski**
   Dir. Strategic Business Development
   Schneider Rucinski Enterprises
2  3344 N Mt. View Dr
   San Diego CA 92116
3  619-282-7977
   Plaintiff in Pro Per
4  Appearing *pro se*

5

6                    **UNITED STATES DISTRICT COURT**

7         **IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

8  SCHNEIDER RUCINSKI ENTERPRISES, )    Case No.: CV 0138 WQH POR
                                     )    (General Civil)
9           Plaintiff,              )
                                     )
10 vs.                              )    **VERIFIED COMPLAINT FOR GENERAL,**
                                     )    **SPECIAL, COMPENSATORY AND**
11 TOUCH ASIA OUTSOURCING            )    **EXEMPLARY & PUNITIVE DAMAGES,**
   SOLUTIONS, INC., dba TOUCH ASIA   )    **FOR:**
12 CALL CENTER, INC.; RUDY NGAW;     )
   STRATASOFT, INC. PACIFIC CALL     )    1.  SPECIFIC PERFORMANCE;
13 CENTERES; LANE MCCARTY            )    2.  BREACH OF CONTRACT;
   individually and as an employee and/or )  3.  BREACH OF LEASE;
14 agent of STRATASOFT, INC.; JASON  )    4.  BREACH OF GUARANTY;
   PACE individually and as an employee )  5.  CLAIM AND DELIVERY;
15 and/or agent of STRATASOFT, INC.; )    6.  CONVERSION;
   MIKE BRIDGES individually and as an )  7.  FRAUD AND DECEIT;
16 employee and/or agent of STRATASOFT, )  8.  DECLARATORY RELIEF;
   INC.; MICHIEL BRIDGES, JR.,       )    9.  ACCOUNT STATED;
17 individually and as an employee and/or ) 10. IMPOSITION OF IMPLIED AND/OR
   agent of STRATASOFT, INC.; INX, INC., )      CONSTRUCTIVE TRUST; and
18 a Texas Corporation formerly known as I- )  11. INJUNCTIVE RELIEF.
   SECTOR CORPORATION; COLO 6 LLC,   )    12. UNFAIR BUSINESS PRACTICES
19 California Corporation, DBA U.S.COLO )      PURSUANT TO Business & Professions
   and HAJI NAVROZ, an individual, and )       Code § 17200 et seq.
20 DOES 1 through 20, inclusive,     )    13. INTENTIONAL INTERFERENCE
                                     )        WITH PROSPECTIVE BUSINESS
21          Defendants.             )        ADVANTAGE
   _____  )    14. NEGLIGENT INTERFERENCE WITH
22                                            PROSPECTIVE BUSINESS
                                              ADVANTAGE
23                                       15. INTENTIONAL INTERFERENCE
                                              WITH CONTRACTUAL RELATIONS
24                                       16. INTENTIONAL INTERFERENCE
                                              WITH CONTRACTUAL RELATIONS
25                                       17. BREACH OF IMPLIED COVENANT
                                              OF GOOD FAITH AND FAIR
26                                            DEALING
                                         18. NEGLIGENT MISREPRESENTATION
27                                       19. FRAUDULENT INDUCEMENT
                                         20. CIVIL CONSPIRACY

                                         DEMAND AMOUNT EXCEEDS $75,000

28                                       JURY TRIAL DEMANDED

                                                                          1

--------------------------------------------------------------------
                        VERIFIED COMPLAINT

Plaintiff, SCHNEIDER RUCINSKI ENTERPRISES, a California Company, [hereinafter "Plaintiff"] complains and alleges as follows:

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1.    For the entire duration of the facts herein alleged and during all other such relevant times, Plaintiff SCHNEIDER RUCINSKI ENTERPRISES (hereinafter "Plaintiff") was and now is a sole proprietorship licensed to conduct business in the County of San Diego County, State of California.

2.    Plaintiff is informed and believes and thereon alleges that Defendant RUDY NGAW (hereinafter "NGAW") is and at all times herein mentioned was an individual residing in Sacramento, County of Sacramento, California and doing business in the County of San Diego, California.

3.    Plaintiff is informed and believes and thereon alleges that Defendant TOUCH ASIA OUTSOURCING SOLUTIONS, INC. ("TOUCH ASIA") is a corporation doing business as TOUCH ASIA CALL CENTER, INC., and as PACIFIC CALL CENTERS, and is duly organized under the laws of the State of California with its principal place of business at 7214-B Florrin Mall Drive, Sacramento, County of Sacramento, California 95823.    Plaintiff is further informed and believes that TOUCH ASIA conducts business within the judicial boundaries of this district.

4.    Plaintiff is informed and believes and thereon alleges that Defendant, STRATASOFT, INC. (hereinafter "STRATASOFT" or "STRATASOFT, INC.") was and at all times herein mentioned a corporation duly organized under the laws of the State of Texas with its principal place of business at 519 N. Sam Houston Pkwy E, Ste 550, Houston, TX 77060-4074.    Plaintiff is further

2

informed and believes that STRATASOFT is doing business in the County of San Diego, California. Plaintiff is further informed and believes and based thereon alleges that Defendant STRATASOFT is a wholly owned subsidiary of Co-Defendant INX, INC., a Texas Corporation formerly known as I-SECTOR CORPORATION.

5.     Plaintiff is informed and believes and thereon alleges that Defendant LANE MCCARTY (hereinafter "MCCARTY") is and at all times herein mentioned was an individual residing in Houston, Texas and doing business in the County of San Diego, California. Said Defendant is an employee and/or agent of STRATASOFT, INC. Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

6.     Plaintiff is informed and believes and thereon alleges that Defendant JASON PACE (hereinafter "PACE") is and at all times herein mentioned was an individual residing in Houston, Texas and doing business in the County of San Diego, California. Said Defendant is an employee and/or agent of STRATASOFT, INC. Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction

3

entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

7.    Plaintiff is informed and believes and thereon alleges that Defendant MIKE BRIDGES (hereinafter "BRIDGES") is and at all times herein mentioned was an individual residing Houston, Texas and doing business in the County of San Diego, California.    Said Defendant is an employee and/or agent of STRATASOFT, INC.    Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

8.    Plaintiff is informed and believes and thereon alleges that Defendant MICHEAL BRIDGES, JR., (hereinafter "BRIDGES, JR.") is and at all times herein mentioned was an individual residing in Houston, Texas and doing business in the County of San Diego, California.    Said Defendant is an employee and/or agent of STRATASOFT, INC.    Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed,

4

frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged. Said Defendant is the son of Defendant BRIDGES.

9.    Plaintiff is informed and believes and thereon alleges that Defendant, INX, INC., ("INX") was and at all times herein mentioned a Texas corporation formerly known as I-SECTOR CORPORATION. Plaintiff is further informed and believes that INX is doing business in the County of San Diego, California.

10.    Plaintiff is informed and believes and thereon alleges that Defendant, NAVROS HAJI, was and at all times herein mentioned a resident of the State of California, County of Los Angeles. Plaintiff is further informed and believes that HAJI NAVROS, is doing business in the County of San Diego, California.

11.    Plaintiff is informed and believes and thereon alleges that Defendant, COLO 6 LLC, DBA U.S. COLO (hereinafter "COLO 6 " or "U.S. COLO") was and at all times herein mentioned a corporation duly organized under the laws of the State of California  with its principal place of business at 650 S. Grand Ave Los Angeles CA 90001 and or One Wilshire Los Angeles Ca 90001 was and at all times herein mentioned doing business in the State of California, County of San Diego.

5

12.     Venue is in this court is proper pursuant to 28 U.S.C. § 1441, because the agreements entered into between Plaintiff and Defendants were entered into within the jurisdictional boundaries of this court.

13.     Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1332, since the parties in this action are citizens of different states, and the amount in controversy, excluding interest is greater than $75,000.00.

14.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 20, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a fictitiously named Defendant is, in some manner, responsible for the events and happenings herein referred to, either contractually or tortuously, and caused the damage to the Plaintiff as herein alleged, and Plaintiff will amend this complaint to allege such true names and capacities when same are ascertained.

15.     At all times herein mentioned, each of the Defendants was and is the agent, servant, and employee of each of the other Defendants and all of the things alleged to have been done by said Defendants were done in the capacity of, and as agent of, the other Defendants.

//

//

/

/

/

6

## FIRST CAUSE OF ACTION

**(Specific Performance Against Defendants and each of them, and DOES 1 through 20, Inclusive)**

16.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 11, inclusive, of the Common Allegations above as though set forth in full herein.

17.    On or about May 11, 2004, Plaintiff through its agent, Noreen Rucinski and INX and STRATASOFT through their agents, Mike Bridges (hereinafter "BRIDGES"), Michiel Bridges (hereinafter "BRIDGES, JR."), Jason Pace (hereinafter "PACE"), and Lane McCarty (hereinafter "MCCARTY") entered into an agreement in which STRATASOFT agreed to sell and Plaintiff agreed to buy telephony servers and software equipment for the sum of 555,000.00 (per the "Agreement").    The telephone equipment (hereinafter referred to as "Equipment") is described as follows:

- 1 – StrataDial.VC2 Telephony Server
- 1 – 120 Agent Station Ports
- 1 – 360 Telephone Line Ports
- 1 – StrataDial.VC2 Supervisor Voice Monitoring Unit
- 1 – StrataDial.VC2 Engine Software 120 Agent by 360 Line License
- 1 – StrataDial.VC2 List Management and Reporting System License
- 1 – StrataDial.VC2 Prospect Management and Reporting System License

7

- 120 – Telephone Sale Representative (TSR) Agent License
- 1 – DynaCall Software License
- 2 StrataQA Software License

In addition the collateral equipment, as follows:

- Excel Hardware switches (32 T-1s & 24 E-1s) [Serial 086068]
- 1 -- EXPU Card with I/O
- 1 -- Power Supply Card
- 1 -- SS7 LC Card
- 1 – ISDN Pri Card

Thereafter, pursuant to the terms of the Agreement, Plaintiff paid STRATASOFT the sum of $128,000.00 as a deposit for the purchase of the Equipment. A copy of Plaintiff's cancelled checks for deposit of the purchase of the Equipment is attached hereto as Exhibit "A" and incorporated herein by this reference.

18.      At the time the Agreement was entered into, the Equipment had a reasonable value of $555,000.00 (en toto per the "Agreement"). Therefore, the agreed purchase price and deposit was fair, just, and adequate.

19.      In reliance on the Agreement to purchase the Equipment, on or about May 11, 2004, Plaintiff and TOUCH ASIA (hereinafter additionally referred to as "LESSEE") entered into an Equipment Lease Agreement (the "Lease") by which Plaintiff (hereinafter additionally referred to as "LESSOR") agreed to lease the Equipment. A true and correct copy of the Lease is attached hereto as Exhibit "B" and incorporated herein by this reference as though fully set forth in full.

8

20.        INX and STRATASOFT, by and through its agents, BRIDGES, PACE AND McCARTY, made the following material representations to Plaintiff:

a) That STRATASOFT, specifically through its agents JASON PACE and MICHAEL BRIDGES, in the event of a default on the lease agreement with TOUCH ASIA, would assist Plaintiff in reselling the equipment to "any of it's sales in the pipeline"

b) that STRATASOFT maintained specific policies and procedures for this type of transaction – i.e., a sale to a lessor and/or leasing company;

c) that STRATASOFT would follow its specific policies and procedures with respect to the negotiation and sale of Equipment with Plaintiff;

d) that STRATASOFT fully understood and agreed that it was selling the Equipment to Plaintiff;

e) that STRATASOFT fully understood and agreed that Plaintiff would thereafter lease the Equipment to TOUCH ASIA and NGAW;

f) that free and clear title to the Equipment would vest in Plaintiff's name;

g) that PLAINTIFF, as owner of the Equipment, would have full access to and control of the toggle and/or software keys (as described in the services and maintenance contract) and could fully control when they were activated or deactivated;

h) that no written contract was needed for this transaction;

9

VERIFIED COMPLAINT

i) that upon payment and clearance of funds to STRATASOFT, Plaintiff would receive a bill of sale/purchase order reflecting the sale to Plaintiff and ship-to/installation at TOUCH ASIA;

j) that after payment and installation, STRATASOFT would enter into a contract with TOUCH ASIA/NGAW for service and maintenance of the Equipment only;

k) that a copy of the service and maintenance contract would be sent to Plaintiff after the serial numbers on the Equipment were confirmed and the Equipment installed at TOUCH ASIA;

l) that a purchase order and cancelled checks was proof of ownership of the Equipment;

m) that the Equipment would not be installed at TOUCH ASIA until a waiver was signed by the landlord; and

n) that after STRATASOFT received payment for installation and the funds cleared; it would send an invoice to Plaintiff for the remainder of the balance due for the purchase of the Equipment.

21.     At all times INX, STRATASOFT, TOUCH ASIA and NGAW had knowledge of Plaintiff's intention to purchase the Equipment from INX, STRATASOFT; and, upon performance in the form of a payment of $128,000 as payment for ownership of that portion for the Equipment, it would lease the Equipment to TOUCH ASIA and NGAW.

22.     On June 28, 2004, without Plaintiff's knowledge or consent, STRATASOFT and INX cause the Equipment to be delivered to TOUCH ASIA at

10

US COLO 650 S Grand Ave Los Angeles. A true and correct copy of an electronic mail dated May 26, 2004, from TOUCH ASIA acknowledging delivery of the Equipment is attached hereto as Exhibit "C" and incorporated herein by this reference. Thereafter, Plaintiff demanded an invoice, purchase order, and the maintenance and service contract as promised by STRATASOFT and INX. Plaintiff's request was refused by STRATASOFT and INX. STRATASOFT and INX thereafter ceased any and all communications with Plaintiff.

23.     Plaintiff has performed all of the conditions of the Agreement that are required to be performed by Plaintiff. Plaintiff remains ready and willing to perform all terms of the Agreement applicable to Plaintiff. Plaintiff herein alleges and asserts that said Defendants, jointly and each of them, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

24.     Plaintiff has no speedy and adequate remedy at law because the Agreement as described in paragraphs 13 through 19, was an agreement for the sale of Equipment to Plaintiff and; thereafter, for delivery of the Equipment to TOUCH ASIA and NGAW. Further, STRATASOFT and INX, without Plaintiff's knowledge or consent, delivered the Equipment to TOUCH ASIA, without providing Plaintiff any proof of ownership of the equipment

11

25.      As a direct and proximate result of the foregoing, Plaintiff seeks an order that STRATASOFT and INX and their agents specifically perform the terms of the Agreement and deliver the bill of sale/purchase order reflecting the sale of the Equipment to Plaintiff; an order that STRATASOFT and INX and their agents specifically perform the terms of the Agreement and deliver the Equipment; and, an order that Plaintiff is true owner of the equipment as evidenced by the checks reflecting payment to STRATASOFT and INX and their agents, and for an order requiring STRATASOFT to execute a list of potential current "pipeline" sales for the defaulted equipment.,

## SECOND CAUSE OF ACTION

### (Breach of Contract Against Defendants and each of them and DOES 1 through 20, Inclusive)

26.      Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 23, inclusive, of the Common Allegations, and the First Cause of Action,  above as though set forth in full herein.

27.      Defendants' failure and refusal to perform their obligations under the contract constitute a breach of contract and have damaged Plaintiff in the following manner: as a result of the breach by STRATASOFT and INX, Plaintiff has been damaged in the amount of $555, 000.00 (en toto per the Agreement), which represents the fair market value of the equipment at the time of breach, plus the amount Defendant's are owing under the terms of the ELA in the amount of $126,000 [i.e. 14 payments x $9,000], in addition to the loss of

12

future use of the equipment, applying industry market standards, in an amount to be proved at trial.

28.     Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged. As a direct and proximate result of the foregoing, Plaintiff has been damaged in the amount of $555,000.00, plus interest, and other reasonable charges in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION

**(Breach of Lease Agreement Against Defendants and each of them**

**and DOES 1 through 20, Inclusive)**

29.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 26, inclusive, of the Common Allegations, and the First and Second Causes of Action,  above as though set forth in full herein.

30.     On or about May 11, 2004, Plaintiff and TOUCH ASIA (collectively, "LESSEE") entered into an Equipment Lease Agreement (the "Lease") by which Plaintiff agreed to rent under lease the  Equipment in return for which LESSEE agreed to pay a single deposit of $30,000.00 due upon signing

13

the Agreement, followed by eighteen (18) consecutive monthly rental payments of $9,000.00, plus applicable taxes. A true and correct copy of the Lease is attached hereto as Exhibit "B" and incorporated herein by this reference as though fully set forth in full.

31.     On June 28, 2004 TOUCH ASIA confirmed delivery of the Equipment. A true and correct copy of an electronic mail dated May 26, 2004 from TOUCH ASIA acknowledging delivery of the Equipment is attached hereto as Exhibit "C" and incorporated herein by this reference.

32.     Plaintiff has performed all of the conditions, covenants, and agreements on its part to be performed in accordance with the terms of the Lease.

33.     In or about December 2004, LESSEE breached the Lease by failing to make the monthly installment due on that date and all subsequent payments due thereafter. Pursuant to the terms of the Lease, Defendant must pay to Plaintiff an amount equal to the additional fourteen (14) payments, plus additional monthly fees, late fees, interest and penalties. Therefore, Plaintiff has declared the entire unpaid balance due under the Lease in the principal amount of $555,000.00 plus late fees, interest, penalties and other reasonable charges, all due and payable and has notified the LESSEE of same.

34.     Despite numerous demands by Plaintiff, LESSEE has failed and continues to fail and refuse, to pay any sums whatsoever due and owing to Plaintiff pursuant to the terms of the Lease. Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed,

14

frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

35.    There is now due, owing and unpaid from TOUCH ASIA to Plaintiff, the sum of $555,000.00,  plus late fees, interest, penalties and other reasonable charges.

36.    Under the terms of the Lease at Section 14, LESSEE agreed to pay all costs and expenses, including reasonable attorneys' fees incurred by Plaintiff in exercising its rights and remedies under the Agreement.

**FOURTH CAUSE OF ACTION**

**(Breach of Guaranty Against Defendants and each of them)**

37.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 34, inclusive, of the Common Allegations, and the First through Third Causes of Action,  above as though set forth in full herein.

38.    On or about May 11, 2004, Defendant NGAW executed a Guaranty in favor of Plaintiff wherein he guaranteed all of the obligations of TOUCH ASIA to Plaintiff under the terms of the Lease.  A true and correct copy of the Guaranty is attached to the Complaint as Exhibit "B" and incorporated herein by this reference.

39.    Due to the default in payments by TOUCH ASIA, Plaintiff has made demand on NGAW to pay all sums due and owing pursuant to the terms of

15

the Guaranty.  Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

40.    Despite demand, NGAW has failed and refused and continue to fail and refuse to pay any sums due and owing to Plaintiff pursuant to the terms of the Guaranty.  There is presently due and owing to Plaintiff pursuant to the terms of the Guaranty the principal sum of $555,000.00 plus late fees, interest, penalties and other reasonable charges, all due and payable.  Plaintiff has duly notified NGAW of same.

41.    Pursuant to the terms of the Guaranty, NGAW is liable for all costs of enforcing the Guaranty, including reasonable attorney fees, costs and other charges incurred by Plaintiff.

**FIFTH CAUSE OF ACTION**

**[Claim and Delivery Against Defendants and each of them and DOES  1 through 20, Inclusive)**

42.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 39, inclusive, of the Common Allegations, and the First through Fourth Causes of Action,  above as though set forth in full herein.

16

43.     Pursuant to the terms of the Agreement providing for the repossession of the Equipment in the event of default, Plaintiff has the right to immediate possession of the Equipment described in the Agreement.  Plaintiff has demanded that Defendants TOUCH ASIA and NGAW deliver up possession of the Equipment; however, Defendants and each of them have failed and refused and continue to refuse to surrender possession of the Equipment and is presently wrongfully and unlawfully retaining same.  Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

44.     By reason of the wrongful withholding by Defendants, Plaintiff is entitled to the return of the Equipment as well as damages.  In the alternative, Plaintiff is entitled to recover from Defendants payment for the actual value of the Equipment, plus damages for loss of use of said Equipment from the date of the wrongful withholding, until paid, or of the date of entry of judgment.  The actual value of the Equipment still in Defendant's possession is not presently known with certainty.

//

/

/

17

## SIXTH CAUSE OF ACTION

### (Conversion Against Defendants and each of them and DOES 1 through 20, Inclusive)

45.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 44, inclusive, of the Common Allegations, and the First through Fifth Causes of Action, above as though set forth in full herein.

46.     Due to the default of Defendants TOUCH ASIA and NGAW, Plaintiff is entitled to immediate possession of the Equipment. Plaintiff has demanded that Defendants deliver possession of the Equipment; however, Defendants have refused, and continue to refuse to surrender possession of the Equipment and have converted the Equipment to their own use.

47.     As a direct and proximate result of the foregoing, Plaintiff has been damaged to the extent of the value of the Equipment in the amount of $555,000.00, plus late fees, interest, penalties and other reasonable charges and in the amounts expended by Plaintiff in seeking the return of the Equipment, all in an amount to be proven at the time of trial.

## SEVENTH CAUSE OF ACTION

### (Fraud and Deceit Against All Defendants, and Each of Them, and DOES 1 through 20, Inclusive)

48.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 47, inclusive, of the Common Allegations, and the First through Sixth Causes of Action, above as though set forth in full herein.

18

49.     At all times STRATASOFT had knowledge of Plaintiff's intention to lease the Equipment to TOUCH ASIA and NGAW.

50.     At all times TOUCH ASIA and NGAW had knowledge of Plaintiff's intention to purchase/license software/equipment from STRATASOFT; and, upon Plaintiff's such performance, it would lease the Equipment to TOUCH ASIA and NGAW.

51.     During the negotiation and sale of Equipment to Plaintiff, STRATASOFT's agents and employees, including but not limited to BRIDGES, PACE and MCCARTY, made the following material representations to Plaintiff:

52.     INX and STRATASOFT, by and through its agents, BRIDGES, PACE AND McCARTY, made the following material representations to Plaintiff:

o) That STRATASOFT, specifically through its agents JASON PACE and MICHAEL BRIDGES, in the event of a default on the lease agreement with TOUCH ASIA, would assist Plaintiff in reselling the equipment to "any of it's sales in the pipeline"

p) that STRATASOFT maintained specific policies and procedures for this type of transaction – i.e., a sale to a lessor and/or leasing company;

q) that STRATASOFT would follow its specific policies and procedures with respect to the negotiation and sale of Equipment with Plaintiff;

r) that STRATASOFT fully understood and agreed that it was selling the Equipment to Plaintiff;

19

s) that STRATASOFT fully understood and agreed that Plaintiff would thereafter lease the Equipment to TOUCH ASIA and NGAW;

t) that free and clear title to the Equipment would vest in Plaintiff's name;

u) that PLAINTIFF, as owner of the Equipment, would have full access to and control of the  toggle and/or software keys (as described in the services and maintenance contract) and could fully control when they were activated or deactivated;

v) that no written contract was needed for this transaction;

w) that upon payment and clearance of funds to STRATASOFT, Plaintiff would receive a bill of sale/purchase order reflecting the sale to Plaintiff and ship-to/installation at TOUCH ASIA;

x) that after payment and installation, STRATASOFT would enter into a contract with TOUCH ASIA/NGAW for service and maintenance of the Equipment only;

y) that a copy of the service and maintenance contract would be sent to Plaintiff after the serial numbers on the Equipment were confirmed and the Equipment installed at TOUCH ASIA;

z) that a purchase order and cancelled checks was proof of ownership of the Equipment;

aa) that the Equipment would not be installed at TOUCH ASIA until a waiver was signed by the landlord; and

20

      bb) that after STRATASOFT received payment for installation and the funds cleared; it would send an invoice to Plaintiff for the remainder of the balance due for the purchase of the Equipment.

      b) that after STRATASOFT received payment for installation and the funds cleared, it would send an invoice to Plaintiff for the remainder of the balance due for the purchase of the Equipment, with additional instructions on how to proceed when the balance was due based on additional approval from other banks for the remaining amount.

    53.     When Defendant STRATASOFT and its representatives made the representations described in paragraph 44 above they knew them to be false and made these representations with the intention to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on these representations to complete its purchase of the Equipment, or with the expectation that Plaintiff would so act.

    54.     Plaintiff, at the time these representations were made by the Defendants and at the time Plaintiff purchased the Equipment from STRATASOFT, was ignorant of the falsity of the representations of Defendant STRATASOFT. In reliance on these representations, Plaintiff was induced to and did purchase the Equipment from Defendant STRATASOFT. Had Plaintiff known the actual facts, it would not have taken such action. Plaintiff's purchase of the Equipment was based upon the representations made by STRATASOFT.

21

Plaintiff's reliance on the Defendant STRATASOFT's representations was justified. Plaintiff had no reason to doubt the validity of the Defendant's representations.

55.     As a proximate result of the fraudulent conduct of the Defendant STRATASOFT as alleged herein, Plaintiff was damaged in a sum subject to proof at the time of trial. Plaintiff was forced to pay $128,000.00 in the form of a good faith deposit to purchase the Equipment.  Plaintiff never received any bill of sale, purchase receipt, or other proof of purchase of the Equipment and therefore is unable to sell the Equipment for what would otherwise be its fair market value but for the proof of ownership and they have been forced to incur attorney fees and costs to prosecute this action.   Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.`

56.     The conduct of Defendant STRATASOFT /INX described herein was an intentional misrepresentation, deceit or concealment of material facts known to STRATASOFT and done with the intention on STRATASOFT's part of thereby depriving Plaintiff of property or legal rights or otherwise causing injury to Plaintiff. Such conduct was despicable and malicious and taken with the intent to injure and cause cruel and unjust hardship to Plaintiff and with a

22

wanton disregard for Plaintiff's rights. Therefore, Plaintiff requests that this court award exemplary and punitive damages against Defendant STRATASOFT.

### EIGHTH CAUSE OF ACTION

**(Declaratory Relief Against Defendants and each of them and DOES 1 through 20)**

57.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 56, inclusive, of the Common Allegations, and the First through Seventh Causes of Action, above as though set forth in full herein.

58.     An actual dispute has now arisen between Plaintiff and Defendants regarding their rights and obligations for the purchase of the Equipment.  Plaintiff maintains that it was purchasing the Equipment as evidenced by its good faith deposit, that Defendant STRATASOFT would enter into a maintenance agreement with TOUCH ASIA for the maintenance of the Equipment; that no bill of sale/purchase order was provided to Plaintiff upon receipt of the good faith deposit, that Defendant cashed Plaintiff's good faith deposit checks and Plaintiff never received any consideration therefore. Defendant STRATASOFT maintains that the Equipment was sold directly to TOUCH ASIA in contradiction of Plaintiff's conversations and transactions with STRATASOFT.

59.     The parties are entitled to a declaration of the rights and obligations of each for the purchase of the Equipment, including the return of Plaintiff's good faith deposit in the sum of $128,000.

23

60.    Plaintiff has been compelled to incur fees for attorneys to prepare this action, which it is entitled to receive from Defendants under the terms of the Agreement.  Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

## NINTH CAUSE OF ACTION

### (Account Stated Against Defendants and each of them and DOES 1 through 20, Inclusive)

61.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 60 nclusive, of the Common Allegations, and the First through Eighth Causes of Action,  above as though set forth in full herein.

62.    During the last four years an account was stated by and between Plaintiff and Defendants TOUCH ASIA and NGAW wherein it was agreed that Defendants TOUCH ASIA and NGAW were indebted to Plaintiff in the sum of $555,000.00 plus interest and other reasonable charges.

63.    No part of said sum has been paid, although demand therefore has been made, and there is now due, owing and unpaid from Defendants TOUCH ASIA and NGAW to Plaintiff the sum of $555,000.00 together with

24

1  interest at the contract rate of 10% (ten percent) from November, 2004, the date

2  the defendant was first in material breach of the ELA

## TENTH CAUSE OF ACTION

### (For Imposition of an Implied or Constructive Against Defendants and each of them and DOES 1 through 20, Inclusive]

64.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 63 inclusive, of the Common Allegations, and the First through Ninth Causes of Action,  above as though set forth in full herein.

65.    As a result of actions, act and conduct of Defendants, and each of them, Plaintiff will suffer irreparable financial loss, harm, injury and damage without the imposition on an implied and/or constructive trust against Defendants, and each of them, for the full monetary and material value, including all unpaid fees, costs and interest thereon, concerning the items, equipment, goods and services which are the subject of this action.

66.    Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.  Plaintiff is entitled to the exclusive use, custody and possession of the items, equipment, goods and services which

25

are the subject of this action, or the full monetary value thereof, including all unpaid fees, costs and interest thereon.

67.    By reason of the foregoing, Plaintiff respectfully requests that the Court issue the imposition on an implied and/or constructive trust against Defendants, and each of them, for the full monetary and material value, including all unpaid fees,  costs and interest thereon, concerning the items,  equipment, goods and services which are the subject of this action.

## ELEVENTH CAUSE OF ACTION

### (For Injunctive Relief Against All Defendants, and Each of Them,

### and DOES 1 through 20, Inclusive)

68.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 67 inclusive, of the Common Allegations, and the First through Tenth Causes of Action,  above as though set forth in full herein.

69.    As a result of actions, acts and conduct of Defendants, jointly and each of them, Plaintiff will suffer irreparable financial loss, harm, injury and damage without granting appropriate injunctive relief, including, as necessary, ex parte Right to Attach Orders (Claim & Delivery – Replevin(Repossession)), ex parte Temporary Protective Orders, and, as also may be necessary, ex parte Preliminary & Permanent Injunctions restraining and/or enjoining Defendants, and each of them, from furthering Plaintiff's financial loss, harm, injury and damage.

70.    Plaintiff has no other plain or speedy remedy at law unless the Court grants appropriate injunctive relief against Defendants.

26

71.    Plaintiff herein alleges and asserts that injunctive relief is necessary to protect and preserve the Status Quo in this case and that the facts of this case evidence that it is far more likely than not that Plaintiff will prevail in this case, therefore, appropriate injunctive relief would be just and proper and would not be prejudicial to any Defendant named herein.  Plaintiff herein alleges and asserts that said Defendant, acting in concert and with the ratification, approval and authorization of each of the other named Defendants herein, obstructed, frustrated and/or impeded the transaction entered into by the Plaintiff and the Defendants named herein, all in bad faith and in direct and/or proximate breach of the express and/or implied Covenant of Good Faith and Fair Dealing that ran with said transaction, all to unjustly enrich himself at Plaintiff's great financial expense, loss, injury, harm and damage as herein described and alleged.

72.    By reason of the foregoing, Plaintiff respectfully requests that the Court issue appropriate injunctive relief and orders as the Court may deem just, equitable and proper.

### TWELVTH CAUSE OF ACTION

### (Unfair Competition in Violation of Cal. Bus. & Prof. Code §17200 et. seq. Against Defendants, and each of them, and Does 1 through 20, inclusive]

73.    Plaintiff hereby restates and reincorporates by reference Paragraphs 1 through 72 above, as though set forth in full herein.

74.    Plaintiff is informed and believes and on that basis thereon alleges, STRATASOFT and all other Defendants' use of the Confidential

27

Information obtained improperly from TOUCH ASIA, and without its consent, to compete against Plaintiff as described herein constitutes unlawful, unfair, and/or fraudulent business practices in violation of Section 17200 et seq. of the California Business and Professions Code and California common law.

75.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered and will continue to suffer substantial pecuniary losses and irreparable injury to its business reputation and goodwill.  As such, Plaintiff's remedy at law is not adequate to compensate for injuries inflicted by Defendants. Accordingly, Plaintiff is entitled to temporary, preliminary and permanent injunctive relief.

76.    By reason of such wrongful acts, Plaintiff is and was, and will be in the future, deprived of the profits and benefits of said business relationships, agreements, and transactions with various existing employees, clients, prospective clients, and/or suppliers, and Defendants have wrongfully obtained such profits and benefits in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

## THIRTEENTH CAUSE OF ACTION

### (Intentional Interference with Contractual Relations

### Against Defendants, and each of them, and DOES 1 through 20)

77.    Plaintiff hereby restates and incorporates by reference Paragraphs 1 through 76 above, as though set forth in full herein.

78.    Plaintiff alleges on information and belief that Defendants and DOES 1 through 20, have willfully and deliberately committed the wrongful acts

28

alleged herein with the intent to interfere with the contractual relations between Plaintiff and its employees, clients, and suppliers.

79.    As a proximate result of such wrongful acts, Plaintiff has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

80.    Plaintiff is informed and believes, and thereon alleges, that the acts of Defendants and DOES 1 through 20, in interfering with Plaintiff's contractual relations with its employees, clients, and suppliers were willful and malicious and designed to obstruct and otherwise interfere with the successful operation of Plaintiff's business.    Plaintiff is therefore is entitled to recover exemplary and punitive damages in a sum sufficient to punish said Defendants.

## FOURTEENTH CAUSE OF ACTION

### (Negligent Interference with Contractual Relations

### Against Defendants, and each of them, and Does 1 through 20, inclusive)

81.    Plaintiff hereby restates and incorporates by reference Paragraphs 1 through 80 above, as though set forth in full herein.

82.    As an incidental beneficiary to the contract between Plaintiff and TOUCH ASIA, Defendant STRATASOFT, and its agents, owed a duty of care to refrain from interfering with Plaintiff's contractual relations.

83.    In engaging in the wrongful conduct described herein, Defendants negligently failed to take ordinary precautions to avoid interfering with Plaintiff's contractual relations and to avoid causing injury to Plaintiff as a result.  Defendants thus breached the duty of care owed to Plaintiff.

29

84.        As a proximate result of breach of duty owed to plaintiff, plaintiff has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

## FIFTEENTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage**

**Against Defendants, and each of them, and Does 1 through 20, inclusive)**

85.        Plaintiff hereby restates and incorporates by reference Paragraphs 1 through 84, above as though set forth in full herein.

86.        Plaintiff alleges on information and belief that Defendant and DOES 1 through 20, willfully and deliberately committed the wrongful acts alleged herein with the intent to harm Plaintiff financially and to induce Plaintiff's existing employees, clients, prospective clients, and suppliers to sever their present and prospective business relationships with Plaintiff.

87.        As a proximate result of such wrongful acts, Plaintiff has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

88.        Plaintiff is informed and believes, and thereon alleges, that the acts of Defendants and DOES 1 through 20, in interfering with Plaintiff's business relationship as described herein were willful and malicious and designed to obstruct and otherwise interfere with the successful operation of Plaintiff's business.   Plaintiff is therefore is entitled to recover exemplary and

30

punitive damages in a sum sufficient to punish Defendants and DOES 1 through 20.

## SIXTEENTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Advantage

### Against Defendants, and each of them, and Does 1 through 20, inclusive)

89.     Plaintiff hereby restates and incorporates by reference Paragraphs 1 through 88 above, as though set forth in full herein.

90.     As an incidental beneficiary to the contract between Plaintiff and TOUCH ASIA, Defendant STRATASOFT, its agents and assigns, owed a duty of care to refrain from interfering with Plaintiff's prospective economic advantages.

91.     In engaging in the wrongful conduct described herein, Defendants negligently failed to take ordinary precautions to avoid interfering with Plaintiff's prospective business opportunities and to avoid causing Plaintiff injury as a result. Defendants thus breached the duty of care owed to Plaintiff.

92.     As a proximate result of Defendant's breach of duty owed to Plaintiff, Plaintiff has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

//

/

//

/

//

31

## SEVENTEENTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

### As against Defendant Defendants, and each of them, Does 1 through 20, inclusive)

93.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 92 of this complaint, and incorporates same by reference as though set forth here in full.

94.     Plaintiff's Equipment Lease Agreement and the personal guarantees herein, contained implied covenants of good faith and fair dealing whereby each party had a duty not to do anything that would injure the rights of the other to receive the benefits of the contract, and do everything to accomplish the contract's purpose.

95.     Implied in the agreement between Plaintiff and Defendants was a duty to act fairly and in good faith with plaintiff in observance of reasonably commercial standards of fair dealing.

96.     Defendant breached its obligation to act fairly and in good faith toward plaintiff by:  Failing to honor its obligations under the ELA, the guarantee, and schedule herein.

97.     As a direct and proximate result of defendant's breach of the implied covenant of good faith and fair dealing, plaintiff has suffered damages including but not limited to attorney's fees and costs incurred in defending the underlying action, the costs of judgment rendered in the underlying action, as well as having suffered, and continuing to suffer, emotional and mental distress.

32

98.    In committing the aforementioned acts, defendant acted with oppression, fraud and malice with the intent to willfully injure, harass, vex, and annoy plaintiff with a conscious disregard for plaintiff's rights.    All of the aforementioned alleged acts were done or ratified by defendant's management-level employees, who acted with knowledge that defendant's conduct would cause plaintiff harm.    Plaintiff is therefore entitled to recover punitive damages pursuant to *Civil Code* §3294.

## EIGHTEENTH CAUSE OF ACTION FOR

## NEGLIGENT MISREPRESENTATION

**[as against Defendants, and each of them,  and Does 1 through 20, inclusive]**

99.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 98 of this complaint, and incorporates same by reference as though set forth here in full.

100.    At the time the Defendants made the representations and promises alleged hereinabove, they did not have a reasonable basis to believe them to be true.  Such representations were positive assertions:

101.    Defendants knew or should have known that said representations and promises were false, and that the same would induce Plaintiff to rely upon them.

102.    As a proximate result of said negligent misrepresentations and promises as herein alleged, Defendants have suffered and will continue to suffer monetary damages in an amount according to proof at trial.

//

/

33

## NINTEENTH CAUSE OF ACTION FOR

## FRAUDULENT INDUCEMENT

**[as against Defendants, and each of them, and Does 1 through 20, inclusive]**

103.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 102 of this complaint, and incorporates same by reference as though set forth here in full.

104.    Plaintiff was fraudulently induced into entering the equipment lease agreement with Defendant TOUCH ASIA, and the guaranties by words, actions, and omissions by the Defendants, and each of them.    But for Defendants' words, actions and omissions, Plaintiff would not have entered into the equipment lease agreement or the personal guaranties thereto.  The conduct which fraudulently induced Plaintiff to enter into the equipment lease agreement and the personal guarantees includes, but is not limited to, the factual allegations contained herein.

105.    Each and every clause, condition and covenant contained in the equipment lease agreement and the personal guarantees was fraudulently induced.

106.    As a proximate result of Defendants fraudulent inducement to enter into the equipment lease agreement and personal guarantees, Plaintiff has been injured in an amount according to proof at trial.  But for Defendants, and each of them, fraudulent inducements, Plaintiff would not have entered into the equipment lease agreement and would not have suffered the injury complained of herein.

//

34

## TWENTYTH CAUSE OF ACTION FOR

## CIVIL CONSPIRACY

**[As against Defendants, and each of them, and Does 1 through 20, inclusive]**

107.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 104 of this complaint, and incorporates same by reference as though set forth here in full.

108.    Defendants, and each of them, expressly or impliedly agreed among themselves to act for their mutual benefit, and to the legal detriment of Plaintiff.   Defendants conspired among themselves to breach the contract and covenant of good faith and fair dealing, to commit fraud and concealment, to violate Business & Professions Code § 17200 et seq, to interfere with Plaintiff's contracts, business relationships and prospective business advantages, to fraudulently induce Plaintiff to enter into the equipment lease agreement, and to otherwise induce plaintiff to act to their economic disadvantage.

109.    To further this agreement between Defendants, Defendants acted unlawfully, as set forth herein.

110.    As a proximate result thereof, Plaintiff has suffered damages in an amount according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays judgment against Defendants, and each of them, jointly and severally, as follows:

**ON ALL CAUSES OF ACTION and as against Defendants and each of them**

a.    For an order that STRATASOFT and INX and its agents specifically perform the terms of the Agreement and deliver the

35

bill of sale/purchase order reflecting the sale of the Equipment to Plaintiff;

b.    For an order that STRATASOFT and INX and its agents specifically perform the terms of the Agreement and deliver a service and maintenance contract for the Equipment; and,

c.    For an order that STRATASOFT and INX and its agents specifically perform the terms of the Agreement and deliver an invoice for the remainder of the balance due for the purchase of the Equipment.

d.    In the event the court does not order Specific Performance of the contract, for compensatory damages in the amount of $555,000.00 for breach of contract;

e.    For the principal sum of $555,000.00 plus interest, late fees, penalties and other reasonable charges;

f.    For reasonable attorneys' fees according to proof;

g.    For immediate possession of the equipment and software access remotely.

h.    For reasonable value of the Equipment in an amount to be proven at the time of trial;

i.    For all sums expended by Plaintiff in seeking the return of the Collateral , in an amount to be proven at the time of trial;

j.    For general damages in an amount to be proven at the time of trial;

36

k.  For special damages in an amount to be proven at the time of trial;

l.  For compensatory damages in an amount to be proven at the time of trial;

m.  For exemplary and punitive damages in an equitable amount to be proven at the time of trial;

n.  For a judicial determination by the court of the rights and duties of the Parties; specifically that Plaintiff is the rightful owner of the Equipment;

o.  For the principal sum of $555,000.00 plus interest, late fees, penalties and other reasonable charges;

p.  For the imposition on an implied and/or constructive trust against Defendants, and each of them, for the full monetary and material value, including all unpaid fees, costs and interest thereon, concerning the items, equipment, goods and services which are the subject of this action;

q.  That the Court issue appropriate injunctive relief and orders as the Court may deem just, equitable and proper;

r.  For general damages in an amount to be proven at the time of trial;

s.  For special damages in an amount to be proven at the time of trial;

t.  For compensatory damages in an amount to be proven at the time of trial;

37

u.  For costs of suit, legal and attorneys' fees herein incurred.

v.  For interest per the parties' agreement/lease from the date of Defendants' breach thereof;

w.  For additional monthly rental from the date of breach of the ELA, to the present, and for each successive rental period thereafter, in addition to the period's thereafter upon which Defendant's unlawfully remained in possession, pursuant to the parties' agreement/lease.

x.  For all legal interest on all damages incurred from the date of Defendants' cause thereof;

y.  For such other and further relief as the court may deem just and proper.

Dated:  January 22, 2008

SCHNEIDER RUCINSKI ENTERPRISES

By: _____
    Noreen Rucinski,
    Dir. Strategic Business Development

38

**JURY TRIAL DEMANDED**

Plaintiff hereby demands Trial by Jury as set forth in the U.S. Constitution.

Dated:  January 22, 2008                    SCHNEIDER RUCINSKI ENTERPRISES


By:_____
    Noreen Rucinski,
    Dir. Strategic Business Development

39

VERIFIED COMPLAINT

# EXHIBIT TABLE

A. Equipment Lease Agreement "ELA" between Plaintiff's and Defendants, dated May 11, 2004.

B. Email correspondence acknowledging receipt of equipment and payment schedule from defendant PACE to Plaintiff, dated May 24, 2004.

C. Equipment Lease Agreement Guarantee signed by RUDY GNAW, dated May 11, 2004.

D. Plaintiff's demand for payment to Defendant RUDY GNAW, dated May 06, 2005.

E. UCC financing Statement

F. Letter from Defendant, STRATASOFT, repudiating the Equipment Lease Agreement, dated December 27, 2005

G. Lease Agreement between Defendant, USA COLO 6 LLC, and NAVROZ HAJI, and Plaintiff, dated June 2004

H. Plaintiff's Schedule and invoice for equipment rental to Defendant, TOUCH ASIA, and other Defendants herein

I. Plaintiff's checks paid to Defendant STRATASOFT

J. Defendant, STRATASOFT, and INX, and its agents, FORM 8K.

MAY 11 2004 9:48AM                                                                P. 1

Schneider Rucinski Enterprises                              3344 N Mt View Dr.
                                                           San Diego, CA 92116
                                                    (619-282-7977• Fax: (619) 282-7989

## Equipment Lease Agreement (Page 1 of 2)

| Customer Information | Lessee Name | | Approval # 100504 |
|---|---|---|---|
| | Touch Asia Call Center Inc | | |
| | Billing Street Address | | Lease # |
| | 7214 B Florin Mall dr      Sacramento 95823 | | |
| | Equipment location (if different from above) | | Customer # |
| | 650 Grand ave  Los Angeles  ca 90017 | | |
| | Lessee Phone # 917-804-6778 | | Tax ID # |

| Supplier Information | Supplier Name | | Contact |
|---|---|---|---|
| | Schneider-Rucinski Ent. | | |
| | Street Address/ City/ State/ Zip | | Supplier Phone # |
| | | | 619-282-7977 |

| Equipment Description | Quantity | Make, Model | Serial Number |
|---|---|---|---|
| | 1 | All software and hardware for attached contract of Stratasoft. Excel switches will serve as collateral during 18 months. | To be given no later than Thursday may 13 2004 |

| Term Purchase Option | (Check one applicable box  If no box is checked or if more than one box is Xed, the Fair Market Value Purchase Option will apply.) | PLUS APPLICABLE TAXES |
|---|---|---|
| | X  Fair Market Value Purchase Option      X  10% Price Purchase Option as long as all terms and conditions of the contract have been meet with. | |

| Term and Lease Payment Schedule | Commencement Date of Lease: May 10, 2004 | You agree to pay at the time you sign this Lease: | PLUS APPLICABLE TAXES |
|---|---|---|---|
| | Total Lease Term (# of Months): 18 | A) Number of Advance Payments: First and second = $9,000.00 | |
| | Monthly Payment Amount $9,000.00 | B) Sales/Use Tax on Advance Lease Payment: = 700.30 | |
| | | C) One-time Documentation Fee and shipping of equipment = $100.00 | |
| | Additional Provisions: Down payment of $30,000 Due upon signing. | D) Total of A + B + C = $ 9,800.20 this includes first month taxes | |

THE UNDERSIGNED AGREES TO ALL OF THE TERMS AND CONDITIONS ABOVE AND ON THE REVERSE OF THIS LEASE AND ANY ATTACHED SUPPLEMENTS AND SCHEDULES WHICH ARE MADE A PART OF THIS LEASE. THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM SHOWN ABOVE.

Lessor, Schneider Rucinski Equipment Leasing Division

This Lease shall not be binding on us until it has been accepted and executed by an officer of the Lessor at its office.

By X _____

Print Name _____

Title _____    Date _____

Lessee: Touch Asia Call Center Inc

This Lease cannot be changed or amended except by an instrument in writing signed by Lessor and Lessee.  The Undersigned affirms that he/she is a duly authorized corporate officer, partner or proprietor of the above name Lessee.

By Rudy NGAW

By _____

Print Names _____

Title  President          Date  5-11-04

## GUARANTY

THIS PERSONAL GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS.  When we use the words "you" and "your" in this Personal Guaranty, we mean the Personal Guarantor(s) indicated below. When we use the words "we", "us" and "our" in this Personal Guaranty, we mean the Lessor named above.

In consideration of our entering into the lease agreement identified above ("Lease"), you unconditionally and irrevocably guarantee to us, our successors and assigns the prompt payment and performance of all obligations of the Customer identified above ("Lessee") under the Lease.  You agree that this is a guaranty of payment and not of collection, and that we can proceed directly against you without first proceeding against the Lessee or against the equipment covered by the Lease.  You waive all defenses and notices, including those of protest, presentment and demand.  You agree that we can renew, extend or otherwise modify the terms of the Lease and you will be bound by such changes.  If the Lessee defaults under the Lease, you will immediately perform all obligations of the Lessee under the Lease, including, but not limited to, paying all amounts due under the Lease.  You will pay to us all expenses (including attorneys' fees) incurred by us in enforcing our rights against you or the Lessee.  This is a continuing guaranty that will not be discharged or affected by your death and will bind your heirs and personal representatives.  You waive any rights to seek repayment from the Lessee in the event you must pay us.  If more than one personal guarantor has signed this Personal Guaranty, each of you agree that your liability is joint and several.  You authorize us or any of our affiliates to obtain credit bureau reports regarding your personal credit and make other credit inquiries that we determine are necessary.

THIS PERSONAL GUARANTY IS GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA.  YOU CONSENT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CALIFORNIA.  YOU EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY.

X _____

Guarantor Signature

Print Name _____    Date _____

Home Street Address/City/State/Zip _____

Social Security Number _____    Home Phone _____

X _____

Guarantor Signature
Rudy Ngaw

Print Name _____    Date  5-11-04

Home Street Address/City/State/Zip _____

Social Security Number _____    Home Phone _____

MAY 11 2004 9:48AM                                                                    P.2

## Equipment Lease Agreement Terms & Conditions (Page 2 of 2)

This Lease has been written in plain English. The words "you" and "your" refer to the Lessee listed above. The words "we", "us" and "our" refer to the Lessor, (S/R) Schneider Rukinski Leasing Division.

1. **TERM AND RENT.** We agree to lease to you and you agree to lease from us the property listed herein or in any attached Schedule, plus any replacements, additions and accessories attached to the property (the "Equipment") for the Lease term listed above. This Equipment and the Supplier have been selected by you and by executing this Lease, you request us to order the Equipment, arrange for its delivery to you and pay for the Equipment upon your acceptance of it. You agree to pay to us the monthly rental shown above for the number of months of the Lease term. Rent for the Interim Rental Term ("Interim Rent") or any other partial rent period will be prorated on a daily basis in an amount equal to 1/30th of the monthly Rent. Rental payments are due monthly beginning in advance on the date you accept the Equipment. Upon receipt of the Equipment, you shall immediately inspect the Equipment and within 5 days deliver to us a signed Nonacceptable letter or acceptance Certificate accepting the Equipment as satisfactory for this Lease. With a 25% restocking fee and/or any applicable fees done by supplier.

2. **DISCLAIMER OF WARRANTIES.** We are leasing the Equipment to you "AS IS". WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE MERCHANTABILITY AND PERFORMANCE OF THE EQUIPMENT OR THE EQUIPMENT'S FITNESS FOR A PARTICULAR PURPOSE OR ITS COMPLIANCE WITH APPLICABLE LAW. You agree not to make any claim for any reason against us for consequential damages. You acknowledge you have been advised that you may have rights against the supplier of the Equipment and that you should contact the supplier for a description of any such rights. So long as this Lease is not in default, we assign to you any warranties received by us in connection with the Equipment.

3. **NONCANCELABLE LEASE.** This Lease cannot be cancelled and you agree that all payment obligations are unconditional.

4. **GOVERNING LAW.** You agree that this Lease shall be governed by the laws of the State of California. You agree that we may bring any action to enforce any provision of this Lease in the County of San Diego, California and you consent to personal jurisdiction in either state or federal court. You agree to binding arbitration should S/R (only) requests it. By signing this document you will not contest arbitration if used. This arbitration will follow the published guidelines for San Diego.

5. **LATE CHARGES.** If any rent or other payment due under this Lease is not paid within 10 days after its due date, you agree to promptly pay a late charge of 5% of the past due payment, subject to a $25 minimum, for those payments under 30 days past due, plus interest on any payments over 30 days past due at the rate of 1.5% per month. However, in no event shall these late charges exceed the maximum lawful charges.

6. **OWNERSHIP OF EQUIPMENT.** We are the owner of the Equipment and you have no rights to the Equipment except as provided for in this Lease. You agree to keep the Equipment clear of all liens and claims.

7. **LOCATION AND USE OF EQUIPMENT.** You agree to use the Equipment only for business purposes and in compliance with applicable laws. You agree to keep the Equipment at the address listed herein or in any Schedule A and not change the location of the Equipment without our advance written consent. At the end of the Lease term (or any renewal term) you agree, at your expense, to return the Equipment to us to our address above, or such address as we may designate in writing, in the same condition it was delivered except for ordinary wear and tear.

8. **EQUIPMENT MAINTENANCE.** You are responsible, at your expense, for installing and maintaining the Equipment in good working order. If any Equipment is damaged, lost or does not work satisfactorily for any reason, you agree to continue to pay all monthly rentals. You shall not make any alterations to the Equipment without our advance written consent. You agree that we may inspect the Equipment at any reasonable time.

9. **INDEMNITY.** You agree that we are not responsible for any losses or injuries caused in connection with the ownership, installation, use, storage, or design of the Equipment. You agree to reimburse us for and defend us against any claims, including negligence and strict liability, whenever made for losses or injuries caused by the Equipment.

10. **TAXES AND FEES.** You agree to pay when due all taxes, filing fees, license fees, interest and penalties relating to this Lease and the Equipment. If we make any of these payments, you agree to reimburse us upon demand. If you have been given a $1.00 end of term purchase option, you agree to directly file and pay when due all property taxes relating to the Equipment during the term of this Lease. Upon receipt of our invoice, you agree to pay us an administrative fee equal to 15% of the property tax bill, subject to a minimum of $5.00 and a maximum of $30.00, if during the term of this Lease we file and pay all property taxes relating to the Equipment. Upon receipt of our invoice, you agree to pay us a Documentation Fee to cover our costs of preparing this Lease. You shall pay to us a fee of $25.00 for every check that is returned to us unpaid by your bank.

11. **RISK OF LOSS.** You are responsible for any loss or damage to the Equipment and/or caused by the Equipment until all of your obligations under this Lease have been fulfilled. You agree to immediately notify us of any such losses or damages and of any insurance claims pertaining to the Equipment. If the Equipment is lost, stolen or damaged, we may require you to promptly repair the Equipment to our satisfaction or replace the Equipment with equipment of equal value, or pay the remaining balance of this Lease (discounted to its present value at a rate of 5% per year) plus any end of term purchase option amount.

12. **INSURANCE.** You agree to keep the Equipment fully insured against loss until this Lease is paid in full, with any loss payable to us. You also agree to obtain a liability insurance policy that is acceptable to us and to include us as an insured on that policy. Before this Lease begins and throughout the term of the Lease, you agree to provide us with the satisfactory evidence of the required insurance. If we obtain any of the required insurance, you agree to pay to us on demand the cost of that insurance, including tracking or other fees, insurance service fees, the insurance premium and related finance charges. You agree that nothing in this Lease will create an insurance relationship between you and us. Once this lease is done you will have insurance letter with in 48 hours or be in breach of this contract.

13. **ASSIGNMENT.** You agree that you have no right to sell, transfer, assign or sublease the Equipment or this Lease without our advance written consent and payment to us of an assignment processing fee. You agree that we may sell or assign this Lease or the Equipment without notice to you, and that our assignee shall have all of our rights but none of our obligations under this Lease. You agree that the rights of our assignee will not be subject to any claims, defenses or setoffs that you may have against us.

14. **DEFAULT AND REMEDIES.** You are in default if you fail to pay any monthly rental when due, or fail to comply with any requirement of this Lease or any requirement of any other obligation to us and/or any requirement of any software license agreement, system support agreement or installation agreement made between you and the supplier named herein. Upon such default, we may require you to immediately pay the remaining balance of this Lease (discounted to its present value at a rate of 5% per year) and return the Equipment to us in good condition. You agree that we are not required to repossess this Equipment and, if the Equipment is not returned to us, you agree to pay to us the value of the Equipment as of the date of your default. If we choose to repossess the Equipment, you agree that we can enter onto your premises and take possession of the Equipment without liability to you for trespass or other damages. We may also use any remedies available to us under the California Commercial Code or any other law. You waive any rights you may have under Section 10606 through 10522 of the California Commercial Code. You agree to pay all of our costs required for the enforcement of this Lease including attorney's fees and the costs of repossessing, storing and selling the Equipment.

15. **RENEWAL.** Unless you have returned the Equipment to us this Lease will be automatically renewed on a continuing month-to-month basis at the end of the original Lease term at the highest Monthly Rental amount in effect during the last 12 months of this Lease. You can terminate this automatic renewal by sending advance written notice to us. Such termination shall be effective 30 days after our receipt of such notice, provided that you have returned the Equipment to us or purchased the Equipment from us by that termination date.

16. **PURCHASE OPTION.** If it is indicated herein that you have been given an end of term purchase option and if you are not in default under this Lease, you may purchase all of the Equipment at the end of the Lease term for the stated price plus applicable taxes. Such purchase of the Equipment shall be "AS IS, WHERE IS" and we make no warranties of any kind. If the purchase price is "Fair Market Value" and we and you cannot agree on such value, you may, at your expense, retain an independent appraiser acceptable to us and such appraisal shall be binding.

17. **MISCELLANEOUS.** You agree that this Lease is the entire agreement with us pertaining to this Equipment and it cannot be changed except in writing. You agree that any delay or failure by us to enforce our rights under this Lease does not prevent us from enforcing any rights at a later time. You agree that we can sign any applicable UCC financing statement as attorney-in-fact for you until such time as all of your obligations to us have been fulfilled. If requested during the term of this Lease, you agree to promptly provide us with genuine and accurate copies of your current balance, sheet income statement and tax returns. This lease is binding upon the successors and assigns of you and us.

**EXHIBIT  B**

Case 3:08-cv-00138-WQH-POR     Document 1     Filed 01/23/2008     Page 45 of 116

Yahoo! Mail - peoplesalliance4justice@andrewlehmanlaw.com                    Page 1 of 3

**YAHOO!** SMALL BUSINESS
CLASSIC

Print - Close Window

**From:**    "noreenrucinski" <noreenr@cox.net>

**To:**      "'A.P.Lehman'" <apl@andrewlehmanlaw.com>

**CC:**      "'noreenrucinski'" <noreenr@cox.net>

**Subject:** email from Jason Pace and Bridges about payment time frame and delivery

**Date:**    Tue, 22 Jan 2008 20:53:28 -0800


-----Original Message-----
From: Jason Pace [mailto:Jason.Pace@Stratasoft.com]
Sent: Wednesday, May 26, 2004 10:24 AM
To: 'Noreenr'
Cc: Michiel Bridges Jr.; Mike Bridges
Subject: Stratasoft Installation with adjusted payment schedule

Noreen,

We have also agreed to the following adjusted payment schedule based on special
consideration for Touch Asia:

A.    Cash Purchase Option

      Total Selling Price
$     254,995.00

      Freight
$     500.00

      Sales Tax
$     0

      Total Amount Due
$     255,495.00


      50% Non-Refundable Deposit with Agreement
$     127,747.50

      25% Due on Stratasoft Installers Arrival
$     63,873.75

      25% Due on Completion of Installation, Training & Acceptance        $
63,873.75

      100% Paid    Total
$     255,495.00

Jason Pace
Vice President Sales
Stratasoft, Inc.
Direct Office:  (713) 795-2607
Toll Free:  (800) 390-1157
Facsimile:  (713) 795-2600
jason.pace@stratasoft.com
www.stratasoft.com

Case 3:08-cv-00138-WQH-POR     Document 1     Filed 01/23/2008     Page 46 of 116

Yahoo! Mail - peoplesalliance○justice@andrewlehmanlaw.com                    Page 2 of 3

AMEX: ISR
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This communication contains privileged, confidential and/or proprietary
information and is only intended to be read by the recipient.
If you have received this message by mistake, please delete its contents
immediately or call the above sender at 713-795-2607.  Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


-----Original Message-----
From: Jason Pace
Sent: Wednesday, May 26, 2004 12:15 PM
To: 'Noreenr'
Cc: Michiel Bridges Jr.; Mike Bridges
Subject: Stratasoft Installation


Noreen,

Per our conversation, Touch Asia's installation will be confirmed for the week of
June 28th pending the balance of the downpayment equal to $27,747.50 by mid next
week. Any delay will result in rescheduling installation for a later date.

The following is the payment schedule in Exhibit C of the Stratasoft
contract:

A.     Cash Purchase Option

       Total Selling Price                            $
254,995.00

       Freight                                        $
500.00

       Sales Tax
$      0

       Total Amount Due
$      255,495.00


       50% Non-Refundable Deposit with Agreement      $
127,747.50

       25% Due on Shipment of Equipment               $
63,873.75

       25% Due on Completion of Installation and Training   $
63,873.75

       100% Paid    Total
$      255,495.00

Thank you.


Jason Pace
Vice President Sales
Stratasoft, Inc.

Case 3:08-cv-00138-WQH-POR    Document 1    Filed 01/23/2008    Page 47 of 116

Yahoo! Mail - peoplesalliance⬤ustice@andrewlehmanlaw.com                    Page 3 of 3

```
Direct Office:  (713) 795-2607
Toll Free:  (800) 390-1157
Facsimile:  (713) 795-2600
jason.pace@stratasoft.com
www.stratasoft.com
AMEX: ISR
****************************************************************************
This communication contains privileged, confidential and/or proprietary
information and is only intended to be read by the recipient.
If you have received this message by mistake, please delete its contents
immediately or call the above sender at 713-795-2607.  Thank you.
****************************************************************************
```

## Equipment Lease Agreement (Page 1 of 2)

**Customer Information**

Lessee Name
Touch Asia Call Center Inc

Billing Street Address
7214 S Florin Mall dr          Sacramento 95823

Equipment location (if different from above)
659 Grand ave  Los Angeles  ca 90017

Lessee Phone # 917-804-6773

Approval # 100804

Lease #

Customer #

Tax ID #

**Supplier Information**

Supplier Name
Schneider-Rucinski Ent.

Street Address/ City/ State/ Zip

Contact

Supplier Phone #
619-253-7977

**Equipment Description**

| Quantity | Make, Model | Serial Number |
|---|---|---|
| 1 | All software and hardware for attached contract of Startsoft. Must switches will serve as collateral during 18 months. | To be given no later than Thursday may 13 2004 |

**Term Purchase Option**

(Check one applicable box  If no box is checked or if more than one box is X'ed, the Fair Market Value Purchase Option will apply)

X) Fair Market Value Purchase Option

X  10% Price Purchase Option as long as all terms and conditions of the contract have been meet with.

PLUS APPLICABLE TAXES

**Term and Lease Payment Schedule**

Commencement Date of Lease:
May 10, 2004

Total Lease Term (# of Months):
18

Monthly Payment Amount:
$8000.00

Additional Provisions:
Down payment of $30,000
Due upon signing.

You agree to pay at the time you sign this Lease.
A) Number of Advance Payments: First and second
= $9,000.00
B) Sales/Use Tax on Advance Lease Payment:
= 700.30
C) One-time Documentation Fee and shipping of equipment
= $100.00
D) Total of A + B + C = $ 9,800.20 this includes first month taxes

PLUS APPLICABLE TAXES

THE UNDERSIGNED AGREES TO ALL OF THE TERMS AND CONDITIONS ABOVE AND ON THE REVERSE OF THIS LEASE AND ANY ATTACHED SUPPLEMENTS AND SCHEDULES WHICH ARE MADE A PART OF THIS LEASE. THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM SHOWN ABOVE.

Lessor, Schneider Rucinski Equipment Leasing Division

This Lease shall not be binding on us until it has been accepted and executed by an officer of the Lessor at its office.

By X _____

Print Name
Noreen Rucinski   may 12 04

Title                          Date

Lessee: Touch Asia Call Center Inc

This Lease cannot be changed or amended except by an instrument in writing signed by Lessor and Lessee. The undersigned affirms that he/she is a duly authorized corporate officer, partner or proprietor of the above lessee Lessee.

By Rudy NGAW
By _____

Print Names _____

Title  President                5-11-04
                                Date

## GUARANTY

THIS PERSONAL GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS. When we use the words "you" and "your" in this Personal Guaranty, we mean the Personal Guarantor(s) indicated below. When we use the words "we", "us" and "our" in this Personal Guaranty, we mean the Lessor named above.

In consideration of our entering into the lease agreement identified above ("Lease"), you unconditionally and irrevocably guarantee to us, our successors and assigns the prompt payment and performance of all obligations of the Customer identified above ("Lessee") under the Lease. You agree that this is a guaranty of payment and not of collection, and that we can proceed directly against you without first proceeding against the Lessee or against the equipment covered by the Lease. You waive all defenses and notices, including those of protest, presentment and demand. You agree that we can renew, extend or otherwise modify the terms of the Lease and you will be bound by such changes. If the Lessee defaults under the Lease, you will immediately perform all obligations of the Lessee under the Lease, including, but not limited to, paying all amounts due under the Lease. You will pay to us all expenses (including attorneys' fees) incurred by us in enforcing our rights against you or the Lease. This is a continuing guaranty that will not be discharged or affected by your death and will bind your heirs and personal representatives. You waive any rights to seek repayment from the Lessee in the event you must pay us. If more than one personal guarantor has signed this Personal Guaranty, each of you agree that your liability is joint and several. You authorize us or any of our affiliates to obtain credit bureau reports regarding your personal credit and make other credit inquiries that we determine are necessary.

THIS PERSONAL GUARANTY IS GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA. YOU CONSENT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CALIFORNIA. YOU EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY.

X _____
Guarantor Signature

Print Name                          Date

Home Street Address/City/State/Zip

Social Security Number          Home Phone

X _____
Guarantor Signature
Rudy Ngaw                           5-11-04
                                    Date

Print Name                          Date

Home Street Address/City/State/Zip

Social Security Number          Home Phone

## Equipment Lease Agreement Terms & Conditions (Page 2 of 2)

This Lease has been written in plain English. The words "you" and "your" refer to the Lessee listed above. The words "we", "us" and "our" refer to the Lessor, (S/R) Schneider Rucinski Leasing Division.

**1.   TERM AND RENT.**  We agree to lease to you and you agree to lease from us the property listed herein or in any attached Schedule, plus any replacements, additions and accessories attached to the property (the "Equipment") for the Lease term stated above.  This Equipment and the Supplier have been selected by you and by executing this Lease, you request us to order the Equipment, arrange for its delivery to you and pay for the Equipment upon your acceptance of it.  You agree to pay to us the monthly rental shown above for the number of months of the Lease term.  Rent for the Interim Rental Term ("Interim Rent") or any other partial rent period will be prorated on a daily basis in an amount equal to 1/30th of the monthly Rent. Rental payments are due monthly beginning in advance on the date you accept the Equipment.  Upon receipt of the Equipment, you shall immediately inspect the Equipment and within 5 days deliver to us a signed Nonacceptable letter or acceptance Certificate accepting the Equipment as satisfactory for this Lease. With a 25% restocking fee and/or any applicable fees done by supplier.

**2.   DISCLAIMER OF WARRANTIES.**  We are leasing the Equipment to you "AS IS".  WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE MERCHANTABILITY AND PERFORMANCE OF THE EQUIPMENT OR THE EQUIPMENT'S FITNESS FOR A PARTICULAR PURPOSE OR ITS COMPLIANCE WITH APPLICABLE LAW.  You agree not to make any claim for any reason against us for consequential damages.  You acknowledge you have been advised that you may have rights against the supplier of the Equipment and that you should contact the supplier for a description of any such rights.  So long as this Lease is not in default, we assign to you any warranties received by us in connection with the Equipment.

**3.   NONCANCELABLE LEASE.**  This Lease cannot be cancelled and you agree that all payment obligations are unconditional.

**4.   GOVERNING LAW.**  You agree that this Lease shall be governed by the laws of the State of California.  You agree that we may bring any action to enforce any provision of this Lease in the County of San Diego, California and you consent to personal jurisdiction in either state or federal court.  You agree to binding arbitration should S/R (only) requests it. By signing this document you will not contest arbitration if used.  This arbitration will follow the published guidelines for San Diego.

**5.   LATE CHARGES.**  If any rent or other payment due under this Lease is not paid within 10 days after its due date, you agree to promptly pay a late charge of 6% of the past due payment, subject to a $25 minimum, for those payments under 30 days past due, plus interest on any payments over 30 days past due at the rate of 1.5% per month.  However, in no event shall these late charges exceed the maximum lawful charges.

**6.   OWNERSHIP OF EQUIPMENT.**  We are the owner of the Equipment and you have no rights to the Equipment except as provided for in this Lease.  You agree to keep the Equipment clear of all liens and claims.

**7.   LOCATION AND USE OF EQUIPMENT.**  You agree to use the Equipment only for business purposes and in compliance with applicable laws.  You agree to keep the Equipment at the address listed herein or in any Schedule A and not change the location of the Equipment without our advance written consent.  At the end of the Lease term (or any renewal term) you agree, at your expense, to return the Equipment to us to our address above, or such address as we may designate in writing, in the same condition it was delivered except for ordinary wear and tear.

**8.   EQUIPMENT MAINTENANCE.**  You are responsible, at your expense, for installing and maintaining the Equipment in good working order.  If any Equipment is damaged, lost or does not work satisfactorily for any reason, you agree to continue to pay all monthly rentals.  You shall not make any alterations to the Equipment without our advance written consent.  You agree that we may inspect the Equipment at any reasonable time.

**9.   INDEMNITY.**  You agree that we are not responsible for any losses or injuries caused in connection with the ownership, installation, use, storage, or design of the Equipment. You agree to reimburse us for and defend us against any claims, including negligence and strict liability, whenever made for losses or injuries caused by the Equipment.

**10.   TAXES AND FEES.**  You agree to pay when due all taxes, filing fees, license fees, interest and penalties relating to this Lease and the Equipment.  If we make any of these payments, you agree to reimburse us upon demand.  If you have been given a $1.00 end of term purchase option, you agree to directly file and pay when due all property taxes relating to the Equipment during the term of this Lease.  Upon receipt of our invoice, you agree to pay an administrative fee equal to 15% of the property tax bill, subject to a minimum of $5.00 and a maximum of $39.00, if during the term of this Lease we file and pay all property taxes relating to the Equipment.  Upon receipt of our invoice, you agree to pay to us a Documentation Fee to cover our costs of preparing this Lease.  You shall pay to us a fee of $25.00 for every check that is returned to us as unpaid by your bank.

**11.   RISK OF LOSS.**  You are responsible for any loss or damage to the Equipment and/or caused by the Equipment until all of your obligations under this Lease have been fulfilled.  You agree to immediately notify us of any such losses or damages and of any insurance claims pertaining to the Equipment.  If the Equipment is lost, stolen or damaged, we may require you to promptly repair the Equipment to our satisfaction or replace the Equipment with equipment of equal value, or pay the remaining balance of this Lease (discounted to its present value at a rate of 6% per year) plus any end of term purchase option amount.

**12.   INSURANCE.**  You agree to keep the Equipment fully insured against loss until this Lease is paid in full, with any loss payable to us.  You also agree to obtain a liability insurance policy that is acceptable to us and to include us as an insured on that policy. Before this Lease begins and throughout the term of this Lease, you agree to provide us with the satisfactory evidence of the required insurance.  If we obtain any of the required insurance, you agree to pay to us on demand the cost of that insurance, including tracking or other fees, insurance service fees, fee insurance premium and related finance charges.  You agree that nothing in this Lease will create an insurance relationship between you and us.  Once this lease is done you will have insurance letter with in 48 hours or be in breach of this contract.

**13.   ASSIGNMENT.**  You agree that you have no right to sell, transfer, assign or sublease the Equipment or this Lease without our advance written consent and payment to us of an assignment processing fee.  You agree that we may sell or assign this Lease or the Equipment without notice to you, and that our assignee shall have all of our rights but none of our obligations under this Lease.  You agree that the rights of our assignee will not be subject to any claims, defenses or setoffs that you may have against us.

**14.   DEFAULT AND REMEDIES.**  You are in default if you fail to pay any monthly rental when due, or fail to comply with any requirement of this Lease or any requirement of any other obligation to us and/or any requirement of any software license agreement, system support agreement or installation agreement made between you and the supplier named herein.  Upon such default, we may require you to immediately pay the remaining balance of this Lease (discounted to its present value at a rate of 6% per year) and return the Equipment to us in good condition.  You agree that we are not required to repossess the Equipment and, if the Equipment is not returned to us, you agree to pay to us the value of the Equipment as of the date of your default.  If we choose to repossess the Equipment, you agree that we can enter onto your premises and take possession of the Equipment without liability to you for trespass or other damages.  We may also use any remedies available to us under the California Commercial Code or any other law.  You waive any rights you may have under Section 10508 through 10522 of the California Commercial Code. You agree to pay all of our costs required for the enforcement of this Lease including attorney's fees and the costs of repossessing, storing and selling the Equipment.

**15.   RENEWAL.**  Unless you have returned the Equipment to us this Lease will be automatically renewed on a continuing month-to-month basis at the end of the original Lease term at the highest Monthly Rental amount in effect during the last 12 months of this Lease.  You can terminate this automatic renewal by sending advance written notice to us.  Such termination shall be effective 30 days after our receipt of such notice, provided that you have returned the Equipment to us or purchased the Equipment from us by that termination date.

**16.   PURCHASE OPTION.**  If it is indicated herein that you have been given an end of term purchase option and if you are not in default under this Lease, you may purchase all of the Equipment at the end of the Lease term for the stated price plus applicable taxes.  Such purchase of the Equipment shall be "AS IS, WHERE IS" and we make no warranties of any kind.  If the purchase price is "Fair Market Value" and we and you cannot agree on such value, you may, at your expense, retain an independent appraiser acceptable to us and such appraisal shall be binding.

**17.   MISCELLANEOUS.**  You agree that this Lease is the entire agreement with us pertaining to this Equipment and it cannot be changed except in writing.  You agree that any delay or failure by us to enforce our rights under this Lease does not prevent us from enforcing any rights at a later time.  You agree that we can sign any applicable UCC financing statement as attorney-in-fact for you until such time as all of your obligations to us have been fulfilled.  If requested during the term of this Lease, you agree to promptly provide us with genuine and accurate copies of your current balance, sheet income statement and tax returns.  This Lease is binding upon the successors and assigns of you and us.

Yahoo! Mail - peoplesalliance●ustice@andrewlehmanlaw.com ●                    Page 1 of 2

**YAHOO!** SMALL BUSINESS
              CLASSIC                                              Print - Close Window

**From:**    "noreenrucinski" <noreenr@cox.net>

**To:**      "'A.P.Lehman'" <apl@andrewlehmanlaw.com>

**Subject:** FW: last chance- email and demand May 06 2005

**Date:**    Thu, 17 Jan 2008 09:54:22 -0800

This is the email and demand final

Noreen Rucinski
Dir. Strategic Business Development
Schneider Rucinski Enterprises
3344 N Mt. View Dr
San Diego CA 92116
619-282-7977 (O)
619-279-2002 (C)

noreenr@cox.net
noreen@c4usolutions.com

---

**From:** Noreen Rucinski [mailto:noreenr@cox.net]
**Sent:** Friday, May 06, 2005 12:55 PM
**To:** Rudy Ngaw
**Subject:** last chance

Dear Rudy,

This is inform you that this is your  last opportunity to resolve your non-payment of funds and/
or return of equipment with out having this turned over to the agencies that will complete the
performance of picking up the equipment.

I have a signed contract from you for a deposit of the 30k as well as a lease for the original
costs plus interest.

You have failed to pay on your contract whether in good will or good faith which you have
been offered both opportunities.


The courts can rule on this from your contract as well as your emails saying it can be picked
up.

I am offering you the opportunities to clear this up and pay what is owed.  You may reach me
on 619-282-7977.

regards
Noreen

Case 3:08-cv-00138-WQH-POR    Document 1    Filed 01/23/2008    Page 53 of 116

Yahoo! Mail - peoplesalliance●ustice@andrewlehmanlaw.com                    Page 2 of 2

**Attachments**

Files:

📎 **Noreen_Ruzinski.vcf** (128)

**EXHIBIT E**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

858-695-1900

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

California Law Professionals
9974 Scripps Ranch Blvd.
#314
San Diego, CA 92131
USA

DOCUMENT NUMBER: 11317290002
FILING NUMBER: 07-7109920824
FILING DATE: 01/31/2007 13:36
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TOUCH ASIA OUTSOURCING SOLUTIONS, INC. | | | | |

| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7214-B FLORIN MALL DR | SACRAMENTO | CA | 95823 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Corporation | California | C2474521  ☐NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TOUCH ASIA CALL CENTER, INC. | | | | |

| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7214-B FLORIN MALL DR | SACRAMENTO | CA | 95823 | USA |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | CORPORATION | | ☐NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SCHNEIDER RUCINSKI ENTERPRISES | | | | |

| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2344 NORTH MOUNTAINVIEW DR. | SAN DIEGO | CA | 92116 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Attachment(s)

**5. ALT DESIGNATION:** ☑LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

**6.** This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]

**7.** Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY

Page 2

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR** (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME
TOUCH ASIA OUTSOURCING SOLUTIONS, INC.

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|----|---------------------------|------------|----------------------|

10. MISCELLANEOUS:

DOCUMENT NUMBER: 11317290002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME
TOUCH ASIA CONTACT SOLUTIONS, INC.

| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|----|-----------------------------|------------|-------------|--------|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|----------------------|------|-------|-------------|---------|
| 7214-B FLORIN MALL DR | SACRAMENTO | CA | 95823 | USA |

| 11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Corporation | | ☐ NONE |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME** - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME
SCHNEIDER RUCINSKI EQUIPMENT LEASING DIVISION

| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|----|-----------------------------|------------|-------------|--------|

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|----------------------|------|-------|-------------|---------|
| 3344 NORTH MOUNTAINVIEW DR. | SAN DIEGO | CA | 92116 | USA |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

14. Description of real estate:

16. Additional collateral description:

15. Name and address of RECORD OWNER of above-described real estate
(if Debtor does not have a record interest):

17. Check **only** if applicable and check **only** one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check **only** if applicable and check **only** one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

FILING OFFICE COPY

Page 3

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| OR | 19a. ORGANIZATION'S NAME  TOUCH ASIA OUTSOURCING SOLUTIONS, INC. | | |
| | 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

20. MISCELLANEOUS:

DOCUMENT NUMBER: 11317290002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

| 21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (21a or 21b) - do not abbreviate or combine names | | | | |
|---|---|---|---|---|
| OR | 21a. ORGANIZATION'S NAME | | | |
| | 21b. INDIVIDUAL'S LAST NAME  Ngaw | FIRST NAME  Rudy | MIDDLE NAME | SUFFIX |
| 21c. MAILING ADDRESS  7214-B FLORIN MALL DR | CITY  SACRAMENTO | STATE  CA | POSTAL CODE  95823 | COUNTRY  USA |
| 21d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID#, if any  ☐ NONE |

| 22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (22a or 22b) - do not abbreviate or combine names | | | | |
|---|---|---|---|---|
| OR | 22a. ORGANIZATION'S NAME | | | |
| | 22b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 22d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID#, if any  ☐ NONE |

| 23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (23a or 23b) - do not abbreviate or combine names | | | | |
|---|---|---|---|---|
| OR | 23a. ORGANIZATION'S NAME | | | |
| | 23b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 23d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID#, if any  ☐ NONE |

| 24. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (24a or 24b) | | | | |
|---|---|---|---|---|
| OR | 24a. ORGANIZATION'S NAME | | | |
| | 24b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 24c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 25. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (25a or 25b) | | | | |
|---|---|---|---|---|
| OR | 25a. ORGANIZATION'S NAME | | | |
| | 25b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 25c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

FILING OFFICE COPY

## Schneider Rucinski Enterprises

5344 N Mt View Dr
San Diego CA 92116
619-282-7972

**PO/Invoice**
**6042004**

Sold To:  Schneider Rucinski Enterprises
Supplier:  Stratasoft

6401 Southwest Freeway
Houston, TX 77074
1-800-390-1157

Ship To:  **Touch Asia Call Center**
**7214-B Florin Mall Dr.,**
**Sacramento CA**
(916) 427-2932          95823

| Description | Product Number | QTY | List Price | Extended List Price | Extended Discount |
|---|---|---|---|---|---|
| Rack Mounted Telephony Server (Including Monitor, NIC Card, Modem, Mouse, Keyboard | | 6 | | | |
| DMV960A-4T1 Quad Span Dialogic Card | *see below | 1 | | INCLUDED | |
| DMV480A-2T1 Dual Dialogic Card | | 1 | | INCLUDED | INCLUDED |
| DMV2400A Dialogic Resource Board | | 1 | | INCLUDED | INCLUDED |
| Dialogic Channel Card | * see below | 2 | | INCLUDED | INCLUDED |
| Dialogic Resource Card | *see bleow | 1 | | INCLUDED | INCLUDED |
| Alliance Systems Telephony Server Chassis | *see bleow | 1 | | INCLUDED | INCLUDED |
| Stratsoft maintenance for one year | *PER STATA | 1 | | INCLUDED | INCLUDED |
| StrataDial® Engine Software 120 Agent by 360 Line Licenses | | 360 | | INCLUDED | INCLUDED |
| StrataDial® List Management and Reporting System Licenses | | 2 | | INCLUDED | INCLUDED |
| 120 - Telephone Sale Representative (TSR) Blended Agent Licenses | | 120 | | INCLUDED | INCLUDED |
| Strata Q/A  2 licenses | | 2 | | INCLUDED | |
| | | | | | |
| Dell System includes | | | | | |
| PERC4/DI Embedded RAID Controller | | 2 | | INCLUDED | |
| 2 x 36Gb 10k RPM U320 SCSI Hard Drives (RAID 1) | | 2 | include | INCLUDED | |
| *SEE BELOW FOR OTHER INVOICED ITEMS AND SERIAL NUMBERS | | 2 | include | INCLUDED | |

Total Extended List Price:          $254,995.00
Total Extended Discounted Price:

AGREED TO TERMS LIST OF EQUIPMENT AND LICENSES TO SCHNEIDER RUCINSKI ENTERPRISES    DEPOSIT    :    128,000.00
AGREED TO TERMS LIST OF EQUIPMENT AND LICENSES TO SCHNEIDER RUCINSKI ENTERPRISES    NET 60    :    63,000.00
AGREED TO TERMS LIST OF EQUIPMENT AND LICENSES TO SCHNEIDER RUCINSKI ENTERPRISES    NET 90    :    63,000.00

| SERIAL # | DESCRIPTION | ITEM # | ORDERED |
|---|---|---|---|
| DMV480A2T1 | Dialogic Station Card | HX013089 | |
| DMV480A2T1 | Dialogic Station Card | HX013090 | |
| DMV480A2T1 | Dialogic Station Card | HX013091 | |
| DMV960A4T1 | Dialogic Channel Card | HX013807 | |
| DMV960A4T1 | Dialogic Channel Card | HX010831 | |
| DMV960A4T1 | Dialogic Channel Card | HX015441 | |
| DMV960A4T1 | Dialogic Channel Card | HX015440 | |
| DMV2400APCi | Dialogic Resource Card | HX015028 | |
| TYPEII-ARC | Alliance Systems Telephony | E042804-15 | |
| 15SVGA | Hansol 15" SVGA Monitor | G15590350900589 | |
| | Cable, CTBus Assy, 8 Drop | CAB0688 | 1 |
| | Cable ATX 4P to P4 12V | CAB3050 | 1 |
| | DMV960A4TiPCI | DIA4401 | 4 |
| HX015451 | | | |
| HX015444 | | | |
| HX015443 | | | |
| HX015442 | | | |

| | | DESCRIPTION | ITEM # | ORDERED |
|---|---|---|---|---|
| | | DMV2400APCi | DIA453 | 1 |
| 1390398 | | CDROM EIDE 52x Int. | PCCDR0015 | 1 |
| E051204-18 | | I-Series 5000 Enclosure | PCCHAS400 | 1 |

**Law Offices Of**
Michael S. Narsete, P.C.
5433 Westheimer, Suite 950
Houston, Texas 77056

Telephone:  713/622-7040
Facsimile:  713/622-7026

December 27, 2005

Via fax and Certified Mail
Return Receipt Requested

Schneider Rucinski Enterprises
Attn:  Ms. Noreen Rucinski
3344 N. Mt. View Drive
San Diego, CA 92116

Re:     Sale of Dialer and/or Licenses to Touch Asia Call Center, Inc. by Stratasoft, Inc.

Dear Ms. Rucinski:

As you know, I represent the interests of Stratasoft, Inc. in connection with the above.

You have delivered numerous emails and/or placed numerous phone calls concerning the above referenced matter to personnel/employees of my client. Additionally, you and I have had detailed discussions concerning the above referenced topic.  You have asked that we acknowledge what we have done and, further, that we provide certain documentation which you believe to be required by law, including a Bill of Sale.  Lastly, you have demanded that we return to you certain payments received by Stratasoft discussed below.  My client has asked that I review the relevant file materials and respond to you.

My client's file reflects that in or about April, 2004, Touch Asia Call Center, Inc. and Stratasoft executed a Software License/Equipment Sales Agreement (may be referred to as SL/ESA) whereby Stratasoft sold certain equipment and licensed software to Touch Asia.  The dialer and related software licenses were delivered and/or installed for its customer, Touch Asia.  Touch Asia executed a Certificate of Delivery and Acceptance concerning the hardware and software in question and for the training associated with the operation of the dialer.

The system and licenses were paid for through payments received directly from Touch Asia and/or other entities at the direction and/or request of Touch Asia, including Schneider-Rucinski Ent.  It appears that Schneider-Rucinski Ent. paid to Stratasoft the sum of approximately $128,000.00 in that regard.   Apparently, some time after the

execution of the SL/ESA referenced above, Touch Asia executed an Equipment Lease Agreement with Schneider-Rucinski Ent. You advised me that Touch Asia made certain lease payments to the Lessor and then stopped paying. You advised me in our conversation that Schneider-Rucinski Ent. is owed a significant sum of money by Touch Asia. While my client understands and is sympathetic to the problems that you may be having with Touch Asia, Stratasoft will not become involved in nor assist you with any legal dispute which you may have with Touch Asia. Any claims that Schneider-Rucinski Ent. may have against the Lessee or any other responsible parties are your business and do not affect Stratasoft. Stratasoft never executed any contract or agreement with Schneider-Rucinski Ent. You may wish to consult with your attorney regarding any claims that you and/or Schneider-Rucinski Ent. may have against Touch Asia with respect to the lease referenced above and/or otherwise.

Accordingly, we will not be delivering any Bill of Sale or any other similar document as requested by you nor will my client be returning any monies or payments to you as they have no obligation to do so. For your records, we are happy to provide you copies of the checks delivered by Schneider-Rucinski Ent. (see attached).

In closing, you have, on numerous occasions, threatened litigation against my client. Be advised that we will vigorously defend any lawsuit or any other action that is brought against my client and, where appropriate, will file the necessary counterclaims against all responsible parties for recovery of legal fees and other expenses.

Any further questions and/or comments you may have should be directed to me alone and not to my client. You are instructed to communicate with me only and not to employees and/or representatives of my client. If you would like I am happy to visit with or talk to your attorney.

Please call if you would like to discuss the contents of this letter.

Yours very truly,

Michael S. Narsete

Recording Requested By:

I
Schneider Rucinski Enterprises

When Recorded Mail too

Schneider Rucinski Enterprises
Equipment division
3344 N Mt View Dr
San Diego Ca 92116                                        _____ LINE FOR RECORDER'S USE

### LANDLORD'S WAIVER AND CONSENT
(Lease)

Reference is made to the Lease Agreement dated as of June 19, **2003,** between **Schneider Rucinski Enterprises EQUIPMENT DIVISION,** ("Lessor") and Pacific Management Call Centers (Touch Asia Call Centers) ("Lessee"). The execution and recording of this Waiver and Consent are intended to confirm that the Equipment described below and subject to the Lease (the "Equipment") is personal property owned by Lessor and will not be deemed real estate or security for repayment of any loan secured by a Lien on or mortgage or trust deed affecting real property:

Equipment: On Schedule A for telecommunications.

   The undersigned owner or lien holder of the real property herein described (the "Real Property") agrees as follows:

1. The Equipment may be installed on or affixed to the Real Property, and shall remain Lessor's personal property and shall not become realty or a part of the Real Property.

2. The undersigned hereby expressly waives all right, title and interest in and to the Equipment and additions thereto and agrees that Lessor may, at any reasonable time, enter upon the Real Property for the purpose of detaching, removing and repossessing the Equipment regardless of the method by which it may be attached to the Real Property, and may remove and retake the Equipment, provided that Lessor repairs any damage to the Real Property directly resulting from such removal, which repairs are reasonably necessary to restore the Real Property to the condition it was in prior to such removal.

3. The undersigned further waives the right to levy on or distrain the Equipment for rent.

4. This Waiver and Consent shall inure to the benefit of the successors and assigns of Lessor and shall be binding upon the heirs, representatives, successors and assigns of the undersigned.

The Real Property is located at _____,
_____COUNTY,_____COUNTRY OF, and is more fully described in the attached Schedule A.


                                              (Owner or Mortgagee)                    _____

                                                                                      By:

                                                                                      Its:

STATE OF _____)
                                       ) ss.
COUNTY OF _____)

      On this_____ day of _____, 19_____, before me, the undersigned, a Notary Public in and for said County, personally appeared __
_____, known to me (or proved to me on the basis of satisfactory evidence) to be the _____ President, and
_____ Secretary of _____, the Corporation that
executed the within and foregoing instrument, and known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed
the within instrument on behalf of the Corporation therein named and acknowledged to me that such Corporation executed the same pursuant to its By-laws or a resolution of its Board of Directors.

      WITNESS my hand and official seal.


      _____
      Notary Public

**SCHEDULE A**

**(Legal Description of the Property)** Excel Switch

Serial Number


Date Of Manufacture : 9/29/99

Serial Number :086068


32 T1's

24 E1's


1 – EXCPU Card with I/O

1 – Power Supply Card

1 – SS7 LC Card

1 – ISDN PRI Card


AS described by Bong Tech for US COLO

Recording Requested By:

l
Schneider Rucinski Enterprises

When Recorded Mail too

Schneider Rucinski Enterprises
Equipment division
3344 N Mt View Dr
San Diego Ca 92116                                      _____ LINE FOR RECORDER'S USE

## WAIVER AND CONSENT CONCERNING EQUIPMENT
### (Lease)

Reference is made to the Lease Agreement dated as of June 19, **2003 ("Lease"),** between **Schneider Rucinski Enterprises EQUIPMENT DIVISION,** ("Lessor") and Pacific Management Call Centers (Touch Asia Call Centers) ("Lessee"). The execution and recording of this Waiver and Consent Concerning Equipment ("Waiver") are intended to confirm that the Equipment described below and subject to the Lease (the "Equipment") is personal property owned by Lessor and will not be deemed real estate or security for repayment of any loan secured by a Lien on or mortgage or trust deed affecting real property. With respect to said Equipment, the parties agree as follows:

1.    License Agreement.   On _____, 2004, Lessee executed that certain License Agreement with Colo 6, LLC, a California Limited Liability Company ("US Colo"). Pursuant to the terms of the License, US Colo has granted Lessee the right to install and maintain certain equipment (which includes Lessor's Equipment) at the premises described as 650 South Grand Avenue, Suite 1000, Cage "___", Los Angeles, California ("Premises").

2.    Authorization and Consent.    Lessee and Lessor hereby agree and consent to the following:

2.1    In the event of a default by Lessee with respect to its obligations to Lessor, Lessor shall serve written notice of default on US Colo and Lessee. Within four (4) business days from the date that US Colo receives notice of default, Lessee shall either provide US Colo and Lessor with a notice of dispute concerning the default, or Lessee shall be deemed to have acknowledged and consented to the notice of default. In the event that US Colo does not receive a notice of dispute from Lessee, on the fifth (5) business days following the date that US Colo receives said notice of default, US Colo is hereby specifically authorized to allow Lessor to enter the Premises and to remove all or any portion of the Equipment, without any further notice or consents from Lessee. On the other hand, if US Colo timely receives a notice of dispute, then US Colo shall not give either Lessor or Lessee access to the Equipment without further written consent from both Lessor and Lessee, or an order from a court of competent jurisdiction so instructing US Colo.

2.2    The removal of the Equipment shall be at the sole expense of Lessor and Lessee.

2.3    Lessee and Lessor hereby release and waive any and all claims, causes of action or obligations against US Colo from US Colo permitting Lessor to remove said Equipment or from US Colo refusing to allow Lessor to remove the Equipment in the event US Colo receives a notice of dispute from Lessee, including, without limitation, any claims against US Colo's agents, counsel, representatives and employees, of any kind whatsoever, whether known or unknown, relating to or arising out of the removal of the Equipment or the refusal to permit the removal of the Equipment.

2.4    Lessee shall, and hereby does, indemnify and hold harmless US Colo against all losses and expenditures (including reasonable attorneys' fees and costs) which US Colo may incur as the result of or in connection with any claim, suit or other proceeding made or brought against US Colo based upon or relating to the removal or the refusal to allow the removal of the Equipment.

3.    Notices. All notices, and other communications to be delivered pursuant to this Waiver shall be in writing and shall be deemed to have been duly given if sent both by facsimile (to the number listed for each party below), and by overnight delivery, to the following addresses, unless contrary instructions are given by the parties in writing:

To: US Colo               To: Lessee               To: Lessor
Colo 6, LLC
650 South Grand Avenue
Suite 1000
Los Angeles, CA 90017

Fax: (213) 689-4610          Fax: (   )                    Fax: (   )

4.      Attorneys Fees.  In the event of any action, suit or proceeding brought under or in connection with this Waiver, the prevailing party shall be entitled to recover and the non-prevailing party agrees to pay, the prevailing party's costs and expenses in connection therewith, including actual attorneys' fees.

5.      Governing Law.  The laws of the State of California shall govern this Waiver and the rights and obligations of the parties.  All parties consent that venue for filing of any lawsuits brought hereunder shall be in the City of Los Angeles, County of Los Angeles, and State of California.

6.      This Waiver shall inure to the benefit of the successors and assigns of the parties and shall be binding upon the heirs, representatives, successors and assigns of the undersigned.

7.      Interpretation.  At all times material hereto, the parties have had the opportunity to consult with legal counsel of their own choosing concerning their rights and obligations pursuant to this Waiver, the form and content of this Waiver, and the advisability of executing this Waiver.  No provision of this Waiver may be interpreted for or against any party hereto because that party or its legal representative drafted such provision.  If any provision of this Waiver is deemed voidable, or unenforceable, the other provisions of this Waiver shall remain in full force and effect.

        IN WITNESS WHEREOF, the parties hereto have executed or caused this Waiver to be executed as of the Date indicated below.

Dated: June ___, 2004          Dated: June ___, 2004          Dated: June ___, 2004

Colo 6, LLC                    Lessee                         Lessor


By: _____
Navroz Haji,                   By: _____           By: _____
Managing Member                [PRINT NAME]                   [PRINT NAME]

                               [TITLE]                        [TITLE]




**SCHEDULE A**

**(Legal Description of the Property)** Excel Switch

Serial Number


Date Of Manufacture : 9/29/99

Serial Number :086068


32 T1's

24 E1's


1 – EXCPU Card with I/O

1 – Power Supply Card

1 – SS7 LC Card

1 – ISDN PRI Card

AS described by Bong Tech for US COLO

**Schneider Rucinski Enterprises**

3344 N Mt View Dr
San Diego CA 92116
619- 282-7977

**PO/Invoice**
**6042004**

Sold To:  Schneider Rucinski Enterprises
Supplier:  Stratasoft

6401 Southwest Freeway
Houston, TX 77074
1-800-390-1157

Ship To:  **Touch Asia Call Cente**

**7214-B Florin Mall Dr.,**
**Sacramento CA**

916) 427-2932          95823

| Description | Product Number | QTY | List Price | Extended List Price | Extended Discount |
|---|---|---|---|---|---|
| Rack Mounted Telephony Server (Including Monitor, NIC Card, Modem, Mouse Keyboard | | | | | |
| DM/V960A-4T1 Quad Span Dialogic Card | *see bleow | 5 | | INCLUDED | |
| DM/V480A-2T1 Dual Dialogic Card | | 1 | | INCLUDED | INCLUDED |
| DM/V2400A Dialogic Resource Board | | 1 | | INCLUDED | INCLUDED |
| Dialogic Channel Card | * see below | 2 | | INCLUDED | INCLUDED |
| Dialogic Resource Card | *see bleow | 1 | | INCLUDED | INCLUDED |
| Alliance Systems Telephony Server Chassis | *see bleow | 1 | | INCLUDED | INCLUDED |
| Stratsoft maltnenace for one year | *PER STATA | 1 | | INCLUDED | INCLUDED |
| StrataDial® Engine Software 120 Agent by 360 Line Licenses | | 360 | | INCLUDED | INCLUDED |
| StrataDial® List Management and Reporting System Licenses | | 2 | | INCLUDED | INCLUDED |
| 120 - Telephone Sale Representative (TSR) Blended Agent Licenses | | 120 | | INCLUDED | INCLUDED |
| Strata Q/A  2 licenses | | 2 | | | |
| Dell System includes | | 2 | | INCLUDED | |
| PERC4/Di Embedded RAID Controller | | 2 | include | INCLUDED | |
| 2 x 36Gb 10k RPM U320 SCSI Hard Drives (RAID 1) | | 2 | include | INCLUDED | |
| *SEE BELOW FOR OTHER INVOICED ITEMS AND SERIAL NUMBERS | | | | Total Extended List Price: | $254,995.00 |
| | | | | Total Extended Discounted Price: | |

AGREED TO TERMS LIST OF EQUIPMENT AND LICENSES TO SCHNEIDER RUCINSKI ENTERPRISES    DEPOSIT  :    128,000.00
AGREED TO TERMS LIST OF EQUIPMENT AND LICENSES TO SCHNEIDER RUCINSKI ENTERPRISES    NET 60    :    63,000.00
AGREED TO TERMS LIST OF EQUIPMENT AND LICENSES TO SCHNEIDER RUCINSKI ENTERPRISES    NET 90    :    63,000.00

| | | | |
|---|---|---|---|
| DMV480A2T1 | Dialogic Station Card | HX013089 | |
| DMV480A2T1 | Dialogic Station Card | HX013090 | |
| DMV480A2T1 | Dialogic Station Card | HX013091 | |
| DMV960A4T1 | Dialogic Channel Card | HX013807 | |
| DMV960A4T1 | Dialogic Channel Card | HX010831 | |
| DMV960A4T1 | Dialogic Channel Card | HX015441 | |
| DMV960A4T1 | Dialogic Channel Card | HX015440 | |
| DMV2400APCI | Dialogic Resource Card | HX015028 | |
| TYPEII-ARC | Alliance Systems Telephony | E042604-15 | |
| 15SVGA | Hansol 15" SVGA Monitor | G15590350900589 | |
| **SERIAL #** | **DESCRIPTION** | **ITEM #** | **ORDERED** |
| | Cable, CTBus Assy, 8 Drop | CAB0688 | 1 |
| | Cable ATX 4P to P4 12V | CAB3050 | 1 |
| | DMV960A4TIPCI | DIA4401 | 4 |
| HX015451 | | | |
| HX015444 | | | |
| HX015443 | | | |
| HX015442 | | | |

| | | DMV2400APCI | DIA453 | 1 |
|---|---|---|---|---|
| | | CDROM EIDE 52x Int. | PCCDR0015 | 1 |
| 1390398 | | | | |
| | | I-Series 5000 Enclosure | PCCHA5400 | 1 |
| E051204-18 | | | | |

| Description | Investment |
|---|---|
| **StrataDial®** Engine Software 120 Agent by 360 Line Licenses | **$ 173,985.37** |
| **StrataDial®** List Management and Reporting System Licenses | ***-Included-*** |
| 120 - Telephone Sale Representative (TSR) Blended Agent Licenses | ***-Included-*** |
| **StrataDial®** Telephony Server<br><br>❑  120 - Agent Station Ports<br>❑  360 - Telephone Line Ports | *Customer Provided* |
| **StrataDial®** Supervisor Voice Monitoring Units<br>❑  Supporting XX stations | *Customer Provided* |
| 1 Year Warranty on Software | ***-Included-*** |
| On-Site Setup/Installation | ***-Included-*** |
| Minimum 3 Days On-Site Training | ***-Included-*** |
| **DynaCall** | ***-Included-*** |
| **Strata Q/A  2 licenses** | **$ 6,500.00** |
| **StrataVM** | |
| **Web Functionality** *(Optional)*<br><br>❑  Text Chatting<br>❑  Web Collaboration and Co-browsing (unlimited)<br>❑  E-Mail Management | *-Please Call For a Competitive Quote-* |
| **Total Investment for *Touch Asia*** | **$180,485.37 USD** |

*All prices are firm for ninety days from the date of   and are exclusive of tax and freight.*

**EXHIBIT I**

**6106**

NOREEN RUCINSKI
SCHNEIDER RUCINSKI
3344 N MONT VW DR
SAN D. CA 92116

DATE *My 10    09*

31-7188
1240

PAY TO THE
ORDER OF *Stratosoft*                              $ *50,000*

*Fifty Thousand Dollars*

DOLLARS

American Express Centurion Bank
Midvale, Utah 84047

MEMO *Rudy Saftware*

⑆124071889⑆ 905474910116⑈386106

---

**6109**

NOREEN RUCINSKI
SCHNEIDER RUCINSKI
3344 N MONT VW DR
SAN D, CA 92116

DATE *May 21 04*

31-7188
1240

PAY TO THE
ORDER OF *Strata Soft.*                          $ *50,000* °°

*Fifty Thousand Dollars  not*

DOLLARS

American Express Centurion Bank
Midvale, Utah 84047

MEMO *Rudy*

⑆124071889⑆ 905474910116⑈386109

---

**4120**

NOREEN RUCINSKI
SCHNEIDER RUCINSKI
3344 N MONT VW DR
SAN D. CA 92116

DATE *June 4    04*

31-7188
1240

PAY TO THE
ORDER OF *Strato-soft Corp*                      $ *11,000.* °°°

*Seventeen Thousand Dollars  net*

DOLLARS

American Express Bank, FSB
Payable Through American Express Centurion Bank
Utah R/T 1240

MEMO *Avia Parts Cold Center*

⑆124071889⑆ 905474910116⑈384120

EXHIBIT J

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 8-K
### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934
Date of Report (Date of earliest event reported): January 31, 2006 (January 26, 2006)

# INX INC.
(Exact name of registrant as specified in its charter)

| Delaware | 1-31949 | 76-0515249 |
|---|---|---|
| (State of Incorporation) | Commission file number | (I.R.S. Employer Identification No.) |

**6401 Southwest Freeway**
**Houston, Texas 77074**
(Address of Registrant's principal executive offices)
**(713) 795-2000**
(Registrant's telephone number, including area code)
**(Not Applicable)**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## TABLE OF CONTENTS

Item 2.01 Completion of Acquisition or Disposition of Assets
Item 9.01 Financial Statements and Exhibits
EXHIBIT INDEX
Stock Purchase Agreement dated January 26, 2006
Press Release issued January 31, 2006

Table of Contents

**Item 2.01 Completion of Acquisition or Disposition of Assets**

Under a Stock Purchase Agreement dated January 26, 2006 (the "Agreement"), INX Inc. (the "Company") sold all outstanding shares of its Stratasoft, Inc. subsidiary's common stock ("Stratasoft") to The Resource Group International Limited ("Buyer"). The sale was announced in the Company's press release dated January 31, 2006 filed as Exhibit 99.1 to this Form 8-K. Key terms of the Agreement are summarized as follows:

- All outstanding Stratasoft common stock was sold for a purchase price of $3,000,000, reduced by:
  - $800,000 placed in escrow, which is available to satisfy indemnified losses, if any, as defined in the Agreement.

  - $221,470 representing a preliminary net working capital adjustment, as defined. The working capital adjustment is to be finalized by March 27, 2006.
- The Company indemnified Buyer for losses as defined in the Agreement to a maximum of $1.4 million, inclusive of amounts placed in escrow. Excess funds held in escrow will be released on January 26, 2008 unless retained in escrow for potential indemnified losses as allowed in the Agreement under certain circumstances.

- The Company may receive additional consideration in the form of 10% of the outstanding Stratasoft common stock if revenue exceeds $10 million for any consecutive twelve month period within two years of closing.

- The Company may receive additional cash consideration if Stratasoft is sold by Buyer to another party for an amount in excess of $15 million.

Transaction costs of $614,209 are payable by the Company in connection with the transaction. Additional transaction costs of up to $120,000 are payable based on the Company's final purchase price.

**Item 9.01 Financial Statements and Exhibits**

(c) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Stock Purchase Agreement by and among The Resource Group International Limited and INX Inc. dated January 26, 2006 |
| 99.1 | Press Release issued January 31, 2006 |

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**I-SECTOR CORPORATION**

Date: January 31, 2006

By: /s/ Brian Fontana

Brian Fontana
Chief Financial Officer

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 2.1 | · Stock Purchase Agreement by and among The Resource Group International Limited and INX Inc. dated January 26, 2006 |
| 99.1 | Press Release issued January 31, 2006 |

Exhibit 2.1

**STOCK PURCHASE AGREEMENT**
**BY AND BETWEEN**
**THE RESOURCE GROUP INTERNATIONAL LIMITED**
**AND**
**INX INC.**
dated
**January 26, 2006**

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this " *Agreement* ") is made and entered into as of January 26, 2006 (the " *Effective Date* "), by and between The Resource Group International Limited, an exempt Bermuda corporation with offices at 1700 Pennsylvania Avenue NW, Suite 560, Washington, DC 20006 (" *Acquiror* "), and INX Inc., a Delaware corporation with offices at 6401 Southwest Freeway, Houston, Texas 77074 (" *Seller* ").

### RECITALS

A. Stratasoft, Inc., a Texas corporation (" *Target* ") having offices at 6401 Southwest Freeway, Houston, Texas 77074, is a wholly-owned subsidiary of Seller and has issued and outstanding 3,005,000 shares (the " *Shares* "), no par value per share, of its common stock.

B. The Shares constitute all of the outstanding capital stock and voting securities of Target, and Seller owns of record and beneficially all of the Shares as its sole property.

C. Acquiror wishes to purchase from Seller, and Seller wishes to sell to Acquiror, all of the Shares, upon the terms and subject to the conditions set forth herein.

D. The Board of Directors of Seller has determined that it is in the best interests of Seller and Target and their respective shareholders that Seller sell the Shares to Acquiror.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the parties hereto hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF SHARES

1.1 **Purchase and Sale of the Shares** . Upon the terms and subject to the conditions set forth in this Agreement, Acquiror agrees to purchase from Seller, and Seller agrees to sell, assign, transfer and deliver to Acquiror, all of the Shares, free and clear of all liens, pledges, claims, charges, restrictions or other encumbrances, for an aggregate purchase price of, Three Million Dollars ($3,000,000) (the " *Initial Purchase Price* "), subject to adjustment in accordance with Section 1.2 below (as so adjusted, the " *Adjusted Purchase Price* "), which shall be paid by Acquiror to Seller on the Closing Date as follows:

(a) $800,000 of the Initial Purchase Price (the " *Escrow Amount* ") shall be placed in escrow by wire transfer of immediately available funds as provided in Section 1.6 below in order to assure the satisfaction of any obligations of Seller arising under Article VIII hereof; and

(b) The remainder of the Adjusted Purchase Price after the payments set forth in subparagraph (a) above shall be paid by Acquiror to Seller by wire transfer of

immediately available funds to the account (or accounts) designated by Seller in writing prior to the Closing.

1.2 **Purchase Price Adjustment** .

(a) The Initial Purchase Price shall be decreased by the amount that the Working Capital is less than $1.00 (the " *Target Working Capital* ") and shall be increased by the amount that the Working Capital is greater than the Target Working Capital. Such adjustment shall be preliminarily calculated at the Closing in accordance with Section 1.2(c) and finally determined in accordance with Section 1.2(d) through 1.2(h) .

(b) The Seller shall prepare and deliver to Acquiror prior to the Closing Date a statement in the form of Exhibit 1.2(b) which shall set forth the Seller's good faith estimate of Target's Working Capital and the Purchase Price, as adjusted pursuant to Section 1.2(a) (the " *Closing Date Working Capital Statement* "). The Closing Date Working Capital Statement shall contain all information reasonably necessary to determine the Working Capital, including appropriate supporting documentation, and shall be certified by an officer of the Seller (but without personal liability) to be true and correct to the knowledge of such officer and to have been prepared in accordance with this Section 1.2 . The Purchase Price determined in accordance with Section 1.2(a) based upon the Working Capital set forth in the Closing Date Working Capital Statement shall be the " *Preliminary Adjusted Purchase Price* ."

(c) No later than 60 days after the Closing Date, Acquiror will prepare and deliver to the Seller a statement in the form of Exhibit 1.2(c) setting forth Acquiror's determination of Target's Working Capital and the Final Purchase Price as determined pursuant to Section 1.2(a) (the " *Post-Closing Working Capital Statement* "). Current Assets and Current Liabilities set forth on the Post-Closing Working Capital Statement shall not include any category of assets or liabilities not included in the Closing Date Working Capital Statement, and shall not omit any category of assets or liabilities included in the Closing Date Working Capital Statement (even if the relevant amount is zero). The Post-Closing Working Capital Statement shall contain all information reasonably necessary to determine the Working Capital, including appropriate supporting documentation, and shall be certified by an officer of Acquiror (but without personal liability) to be true and correct to the knowledge of such officer and to have been prepared in accordance with Section 1.2 . The Seller shall have the right to visit Target to verify and review such documentation and Target's books and records upon providing reasonable notice to Acquiror. After Acquiror has delivered the Post-Closing Working Capital Statement to the Seller, Acquiror shall not be entitled to raise any additional issues or changes that would result in a decrease in the Working Capital of Target as of the Closing Date.

(d) The Seller shall give written notice to Acquiror of any objection to the Post-Closing Working Capital Statement (the " *Objection Notice* ") within thirty (30) days after the Seller's receipt thereof. The Objection Notice shall specify in reasonable detail the items in the Post-Closing Working Capital Statement to which the Seller objects and shall provide a summary of the Seller's reasons for such objections. In the event the

-2-

Seller does not deliver an Objection Notice within such 30 day period, the Seller shall be deemed to have accepted for all purposes of this Agreement Acquiror's Post-Closing Working Capital Statement. After the Seller has delivered its Objection Notice in accordance with this Section 1.2(d) , it shall not be entitled to raise any additional objections that would result in an increase to the Working Capital of Target as of the Closing Date.

(e) Acquiror and the Seller shall use good faith efforts to resolve any dispute involving any matter set forth in an Objection Notice. If the parties are unable to resolve any dispute involving any matter set forth in an Objection Notice within fifteen (15) Business Days after receipt by Acquiror of the relevant Objection Notice, such dispute shall be referred for decision to Ernst & Young or, if Ernst & Young is unwilling or unable to serve, another nationally recognized accounting firm reasonably acceptable to Acquiror and the Seller who is not engaged in providing services to the Seller or Acquiror or any of their respective Affiliates (the " *Accounting Firm* ") to decide the dispute within 30 days of such referral. The decision by the Accounting Firm with respect to such dispute shall be final and binding on the Seller and Acquiror and shall be based upon a review of any relevant books and records or other documents requested by the Accounting Firm. The cost of retaining the Accounting Firm with respect to resolving disputes as to the Objection Notice shall be borne by the Seller and Acquiror equally.

(f) For purposes hereof, the " *Final Purchase Price* " shall be (i) if the Seller has not delivered an Objection Notice to Acquiror in accordance with Section 1.2(d) , the Purchase Price as determined based upon the determination of Target's Working Capital set forth in the Post-Closing Working Capital Statement or (ii) if the Seller has delivered an Objection Notice to Acquiror in accordance with Section 1.2(d) , the Purchase Price as agreed by Acquiror and the Seller or as determined by the Accounting Firm, as applicable, pursuant to Section 1.2(e) .

(g) If the Preliminary Purchase Price is greater than the Final Purchase Price, the Seller shall, within five (5) Business Days after the date on which the Final Purchase Price is determined in accordance with Section 1.2(f) , pay to Acquiror, by wire transfer of immediately available funds pursuant to wire transfer instructions, which instructions have been delivered by Acquiror to the Seller, the difference between the Preliminary Purchase Price *minus* the Final Purchase Price, together with interest on such amount at 4% per annum from the Closing Date to the date of payment.

(h) If the Preliminary Purchase Price is less than the Final Purchase Price, Acquiror shall, within five (5) Business Days after the date on which the Final Purchase Price is determined in accordance with Section 1.2(f) , pay to the Seller by wire transfer of immediately available funds pursuant to wire transfer instructions, which instructions have been delivered by the Seller to Acquiror at least two (2) Business Days prior, an amount equal to the Final Purchase Price minus the Preliminary Purchase Price, together with interest on such amount at 4% per annum from the Closing Date to the date of Payment.

-3-

1.3 **Earnout Consideration; Sale Consideration** . As further consideration for the Shares, Seller shall be entitled to receive the following amounts upon the occurrence of the events specified below:

(a) If Target achieves $10,000,000 or more in gross operating revenue (net of sales returns and allowances) during any 12 consecutive month period ending on or prior to the earlier of (i) the second anniversary of the Closing Date or (ii) the closing of a Sale Transaction (as defined below), Acquiror shall cause Target to promptly (but in no event later than 30 days following such achievement date) issue and deliver to Seller the number of shares of Target common stock representing 10% of its then outstanding capital stock on a fully diluted basis (the " *Earnout Consideration* "); provided that Seller has executed and delivered to Acquiror and Target customary investment representations and warranties as reasonably deemed necessary or advisable by Acquiror and Target to enable Target to issued the shares comprising the Earnout Consideration to Seller in a private placement pursuant to an exemption from registration under the Securities Act of 1933, as amended. In the event that there is a Sale Transaction after such achievement date but prior to the issuance of the Earnout Consideration, Target (or its assignee or successor in interest) shall issue and/or pay to Seller (in addition to any consideration payable to Seller pursuant to Section 1.3(b) below), as a condition to entering into such Sale Transaction, an amount (payable on a per share basis in the same proportion as the equity and/or cash consideration received by the stockholders of Target in the Sale Transaction) equal to the value such Earnout Consideration would have been entitled to under the terms of such Sale Transaction had such Earnout Consideration been issued to Seller immediately prior to consummation of such Sale Transaction.

(b) If Acquiror consummates a Sale Transaction (as defined below) on or prior to the second anniversary of the Closing Date, Acquiror shall, subject to Section 1.3(c) below, promptly transfer, pay and deliver to Seller an amount, in the same proportions and form(s) of consideration as received by Acquiror in the Sale Transaction, equal to 10% of the amount by which the aggregate equity proceeds received by Acquiror in the Sale Transaction exceed $15,000,000 (such amount, the " *Sale Consideration* "). For purposes of this Agreement, " Sale Transaction " means (1) a sale of all or substantially all of Target's assets, or (2) any merger, consolidation or other business combination transaction of Target with or into another corporation, entity or person, other than a transaction in which the holders of at least a majority of the shares of voting capital stock of Target outstanding immediately prior to such transaction continue to hold (either by such shares remaining outstanding or by their being converted into shares of voting capital stock of the surviving entity) a majority of the total voting power represented by the shares of voting capital stock of Target (or the surviving entity) outstanding immediately after such transaction, or (3) the direct or indirect acquisition (including by way of a tender or exchange offer) by any person, or persons acting as a group, of beneficial ownership or a right to acquire beneficial ownership of shares representing a majority of the voting power of the then outstanding shares of capital stock of Target; provided, however, that any of the transactions described in the foregoing clauses (1) through (3) shall not constitute a Sale Transaction if the buyer or surviving entity of such transaction is a majority-owned subsidiary of Acquiror.

(c) As a condition to Seller's right to receive the Sale Consideration, Seller shall join on a pro rata basis (based on the aggregate proceeds of the Sale Transaction), severally

-4-

and not jointly, in any indemnification or other obligations of the selling stockholders that are specified in the definitive agreements governing the Sale Transaction; provided, that such obligations shall not in any event exceed the Sale Consideration.

(d) Within thirty business days of the end of each calendar quarter, Target shall deliver to Seller its unaudited financial statements for the immediately preceding fiscal quarter. Target's obligation to deliver such financial statements to Seller shall cease upon the earlier of (i) the second anniversary of the Closing Date and (ii) the closing of a Sale Transaction. Target also hereby agrees that at least five days prior to consummating any Sale Transaction Target shall deliver to Seller a written notice of such Sale Transaction, including a description of the material terms and conditions of such Sale Transaction.

1.4 **Closing** . The closing of the purchase and sale of the Shares (the " *Closing* ") shall take place at the offices of Seller at 6401 Southwest Freeway, Houston, Texas 77074 at 10:00 a.m. Central Standard Time on the date hereof, the " *Closing Date* ") or at such other location as the parties hereto agree.

1.5 **Deliveries at the Closing** . At the Closing, the Seller and Acquiror shall take such actions and execute and deliver such agreements and other instruments and documents as necessary or appropriate to effect the transactions contemplated by this Agreement in accordance with its terms, including, without limitation, the following:

(a) Seller shall deliver to Acquiror the certificate(s) representing all of the Shares, duly endorsed in blank for transfer or accompanied by stock powers in proper form duly endorsed in blank;

(b) Acquiror shall pay to Seller the Preliminary Adjusted Purchase Price net of the Escrow Amount;

(c) Each of Acquiror, Seller and the Escrow Agent shall execute and deliver the Escrow Agreement; and

(d) Acquiror shall deliver the Escrow Amount to the Escrow Agent.

1.6 **Escrow** . Notwithstanding any investigation of the business of Target made by or on behalf of Acquiror and in order to assure further satisfaction of any obligations of the Seller arising under Article VI hereof, the Escrow Amount shall be delivered by Acquiror directly to Amegy Bank N.A. (the " *Escrow Agent* "), for deposit in accordance with the terms of the Escrow Agreement to be entered into by and among Acquiror, Seller and the Escrow Agent substantially in the form attached hereto as Exhibit 1.6 (the " *Escrow Agreement* ").

1.7 **No Further Ownership Rights in Shares** . All cash paid in respect of the surrender for exchange of the Shares in accordance with the terms of this Agreement shall be deemed to be full satisfaction of the Seller's rights pertaining to such Shares.

-5-

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES
## OF SELLER

Except as set forth on the Disclosure Schedule attached to this Agreement as Schedule A (the " *Disclosure Schedule* "), the Seller represents and warrants to Acquiror as of the date hereof as follows:

2.1 **Organization, Standing and Power** . Target is a corporation duly organized and validly existing under the laws of the State of Texas. Each of the Subsidiaries of Target, as set forth in Schedule 2.1 of the Disclosure Schedule, is a corporation duly organized and validly existing under the laws of its jurisdiction of organization. Target and each of its Subsidiaries has the corporate power to own its properties and to carry on its business as now being conducted and as proposed to be conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would have a Material Adverse Effect on Target. Seller has delivered to Acquiror a true and correct copy of Target's and each of its Subsidiaries' Articles of Incorporation and Bylaws or other comparable governing documents, as amended to date. Neither Target nor any of its Subsidiaries is in violation of any of the provisions of its Articles of Incorporation or Bylaws (or other comparable governing documents).

2.2 **Authority; No Violations and No Consents** .

(a) Seller has all requisite corporate power and authority to enter into this Agreement and each of the other agreements contemplated hereby (the " *Ancillary Agreements* ") to which Seller is a party and to consummate the transactions contemplated hereby and thereby (including, without limitation, the sale of the equity interests in Target to Acquiror). The execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Seller and Target.

(b) Seller owns, beneficially and of record all of the Shares.

(c) This Agreement and each of the Ancillary Agreements to which it is a party have been duly executed and delivered by Seller and constitute the legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms. The execution and delivery of this Agreement and each of the Ancillary Agreements to which it is a party by Seller does not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under (i) any provision of Target's or any of its Subsidiaries' Articles of Incorporation or Bylaws (or other comparable governing documents) or (ii) solely with respect to Target and its Subsidiaries, any material mortgage, indenture, lease, contract or other agreement or instrument, permit, concession, franchise, license, judgment, order,

-6-

decree, statute, law, ordinance, rule or regulation applicable to Target, any of its Subsidiaries or any of its or their respective properties or assets.

(d) No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or other governmental authority or instrumentality (" *Governmental Entity* ") is required by or with respect to Target, any of Target's Subsidiaries or Seller or in connection with the execution and delivery of this Agreement or any other Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby, except for such consents, authorizations, filings, approvals and registrations which, if not obtained or made, would not have a Material Adverse Effect on Target and would not prevent, or materially alter or delay, any of the transactions contemplated by this Agreement or any of the Ancillary Agreements.

2.3 **Capitalization; Subsidiaries; Title to the Shares** .

(a) The authorized capital stock of Target consists of 5,000,000 shares of common stock, no par value per share. The issued and outstanding capital stock of Target consists solely of the Shares. All outstanding shares of capital stock of Target are duly authorized, validly issued, fully paid and non-assessable and are free and clear of any liens or encumbrances and are not subject to preemptive rights or rights of first refusal. All outstanding shares of capital stock and other securities of Target were issued in compliance with all applicable laws. Each of Target's Subsidiaries is wholly owned by Target.

(b) There are no options, warrants, calls, rights, commitments or agreements of any character (i) obligating Target to issue, deliver, sell, repurchase or redeem any shares of capital stock or any other securities of Target or any of its Subsidiaries; or (ii) obligating Target or any of its Subsidiaries to grant, extend, accelerate the vesting of, change the price of, or otherwise amend or enter into any such option, warrant, call, right, commitment or agreement; or (iii) obligating Seller or its assigns to cause Target or any of its Subsidiaries to do, cause or permit any of the acts described in the preceding subclauses (i) and (ii) . Except for this Agreement, there are no contracts, commitments or agreements of any nature relating to voting, purchase or sale of any of Target's or its Subsidiaries' capital stock, including, without limitation, any commitments to issue voting securities, and no agreements to participate in any income of Target.

(c) The sale and delivery of the Shares as contemplated by this Agreement are not subject to any preemptive right, right of first refusal or other right or restriction, except for restrictions pursuant to federal securities laws and state "Blue Sky" laws. Upon delivery of the certificate(s) representing the Shares in accordance with this Agreement, Acquiror will acquire good and marketable title to the Shares, free and clear of any lien, pledge, claim, charge, restriction or other encumbrance and with no title defects, and will be entitled to all the rights of a holder of such Shares.

2.4 **Financial Statements** . Target has delivered to Acquiror its consolidated unaudited financial statements for the past three fiscal years (collectively, the " *Financial Statements* ").

-7-

Except that (i) the balance sheet represents pro forma presentation due to the elimination of the inter-company note from Seller and (ii) the unaudited financial statements do not have notes thereto, the Financial Statements have been prepared in accordance with generally accepted accounting principles (" *GAAP* ") applied on a consistent basis throughout the periods indicated and with each other. The Financial Statements fairly present the consolidated financial condition and operating results of Target and its consolidated Subsidiaries as of the dates, and for the periods, indicated therein, subject to normal and recurring year-end audit adjustments.

2.5 **Absence of Undisclosed Liabilities** . Neither Target nor any of its Subsidiaries has any material obligations or liabilities of any nature (matured or unmatured, fixed or contingent) other than (i) those set forth or adequately provided for in the balance sheet included in the latest audited Financial Statements (the " *Target Balance Sheet* "), (ii) those incurred in the ordinary course of business and not required to be set forth in the Target Balance Sheet under GAAP, (iii) those incurred in the ordinary course of business since the Target Balance Sheet Date (defined below) and consistent with past practice and (iv) those incurred in connection with the execution of this Agreement.

2.6 **Accounts Receivable** . All Accounts Receivable shown on the Target Balance Sheet (net of reserves indicated on the Target Balance Sheet) or thereafter acquired until the date hereof (net of reserves accrued in the normal course of business and consistent with past practice) represent or will represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business consistent with past practices. The net values at which the Accounts Receivable are carried as a whole reflect the accounts receivable valuation policies of Target, which are consistent with its past practice and in accordance with GAAP applied on a consistent basis. To the Seller's knowledge, none of the Accounts Receivable is subject to any claim of offset, recoupment, set off, or counterclaim (other than as implied under applicable law or such claims for which Seller has accrued reserves in the normal course of business and consistent with past practice), and there are not facts or circumstances (whether asserted or unasserted) that would give rise to any such claim (other than as implied under applicable law or such claims for which Seller has accrued reserves in the normal course of business and consistent with past practice). No person or entity has any lien, charge, pledge, security interest, or other encumbrance on any such Accounts Receivable, and no agreement for deduction or discount has been made with respect to any of such Accounts Receivable.

2.7 **Absence of Certain Changes** . Except as set forth on Schedule 2.7 of the Disclosure Schedule, since the date of the latest unaudited Financial Statements (the " *Target Balance Sheet Date* "), Target and each of its Subsidiaries has conducted its business in the ordinary course consistent with past practice and there has not occurred: (i) any change, event or condition (whether or not covered by insurance) that has resulted in, or might reasonably be expected to result in, a Material Adverse Effect on Target; (ii) any acquisition, sale or transfer of any material asset of Target or any of its Subsidiaries; (iii) any change in accounting methods or practices (including any change in depreciation or amortization policies or rates) or any revaluation of any of Target's or its Subsidiaries assets; (iv) any declaration, setting aside or payment of a dividend or other distribution with respect to any shares of Target or any of its Subsidiaries, or any direct or indirect redemption, purchase or other acquisition by Target or any of its Subsidiaries of any of its capital stock; (v) any material contract entered into by Target or any of its Subsidiaries or any material amendment or termination of, or default under, any

-8-

material contract to which Target or any of its Subsidiaries is a party or by which it, they or any of its or their respective properties is bound; (vi) any amendment or change to the Articles of Incorporation or Bylaws (or other comparable governing documents) of Target or any of its Subsidiaries; (vii) any increase in or modification of the compensation or benefits payable or to become payable by Target or any of its Subsidiaries to its or their respective directors or employees; (viii) labor trouble or claim or wrongful discharge or other unlawful labor practice or action; (ix) commencement or notice or, to the Seller's knowledge, threat of commencement of any lawsuit or proceeding against Target or any of its Subsidiaries; (x) notice to the Seller, Target or any of Target's Subsidiaries of any claim of ownership by a third party of Target's Intellectual Property or of infringement by Target or any of its Subsidiaries of any third party's Intellectual Property rights; or (xi) any negotiation or agreement by Target or any of its Subsidiaries to do, cause or permit any of the things described in the preceding clauses (i) through (x) (other than negotiations with Acquiror and its representatives regarding the transactions contemplated by this Agreement).

2.8 **Title to Property** . Target and each of its Subsidiaries has good and marketable title to all of its respective properties, interests in properties and assets, real and personal, tangible and intangible, reflected in the Target Balance Sheet or acquired after the Target Balance Sheet Date (except properties, interests in properties and assets sold or otherwise disposed of since the Target Balance Sheet Date in the ordinary course of business), or, with respect to leased properties and assets, valid leasehold interests therein, free and clear of all mortgages, liens, pledges, charges or encumbrances of any kind or character, except (i) the lien of current taxes not yet due and payable, (ii) such imperfections of title, liens and easements as do not and will not materially detract from or interfere with the use of the properties subject thereto or affected thereby, or otherwise materially impair business operations involving such properties, (iii) liens securing debt which is reflected on the Target Balance Sheet and (iv) liens set forth on Schedule 2.8 of the Disclosure Schedule. The plants, property and equipment of Target and each of its Subsidiaries that are used in the operation of their respective businesses are in good operating condition and repair, ordinary wear and tear excepted. All properties used in the operations of Target and its Subsidiaries are reflected in the Target Balance Sheet to the extent GAAP requires the same to be reflected. Schedule 2.8 of the Disclosure Schedule sets forth a true, correct and complete list of all real property owned or leased by Target or any of its Subsidiaries, the name of the lessor, the date of the lease and each amendment thereto and the aggregate annual rental and other fees payable under such lease. Such leases are in good standing, are valid and effective in accordance with their respective terms, and there is not under any such leases any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default) by Target or its Subsidiaries (as applicable) or, to the Seller's knowledge, the other parties thereto.

2.9 **Intellectual Property** .

(a) Target or one of its Subsidiaries is the sole owner of, and of all rights of any nature with respect to the software products set forth on Schedule 2.9(a) of the Disclosure Schedule (including, without limitation, any and all translations or derivatives thereof, the " *Software Product* "), and is the sole owner of or is licensed or otherwise possesses legally enforceable rights to use all patents, trademarks, trade names, service marks, copyrights, and any applications therefor, maskworks, net lists, schematics, technology,

-9-

know-how, trade secrets, inventory, ideas, algorithms, processes, computer software programs or applications (in source code and/or object code form), and tangible or intangible proprietary information or material (all of the foregoing, collectively, " *Intellectual Property* ") that are used or proposed to be used in the business of Target and its Subsidiaries as currently conducted or as proposed to be conducted by Target and its Subsidiaries. Without limiting the foregoing and except as set forth on Schedule 2.9(a) of the Disclosure Schedule, neither Target nor any of its Subsidiaries has (i) licensed any of its Intellectual Property in source code form to any third party or (ii) entered into any exclusive agreements relating to its Intellectual Property with any party.

(b) Schedule 2.9(b) of the Disclosure Schedule lists (i) all patents and patent applications and all registered and unregistered trademarks, trade names and service marks, registered and unregistered copyrights, and maskworks included in the Intellectual Property, including the jurisdictions in which each such Intellectual Property right has been acquired, issued or registered or in which any application for such issuance and registration has been filed, (ii) all licenses, sublicenses and other agreements to which Target is a party and pursuant to which any person is authorized to use any Intellectual Property and (iii) all licenses, sublicenses and other agreements as to which Target is a party and pursuant to which Target or any of its Subsidiaries is authorized to use any third party patents, trademarks, tradenames, service marks or copyrights, including software (" *Third Party Intellectual Property Rights* ") which are incorporated in, are, or form a part of any product or service of Target or any of its Subsidiaries.

(c) Except as set forth on Schedule 2.9(c) of the Disclosure Schedule, there is no unauthorized use, disclosure, infringement or misappropriation of any Intellectual Property rights of Target or its Subsidiaries, or any Intellectual Property right of any third party to the extent licensed by or through Target or its Subsidiaries by any third party, including any employee or former employee of Target or its Subsidiaries. Neither Target nor any of its Subsidiaries has entered into any agreement to indemnify any person against any charge of infringement of any Intellectual Property, other than indemnification provisions contained in purchase orders, contracts, consulting agreements and licenses arising in the ordinary course of business, copies of which have been provided to Acquiror.

(d) Neither Target nor any of its Subsidiaries shall be, as a result of the execution and delivery of this Agreement or any of the Ancillary Agreements by Seller, or the performance of Seller's obligations hereunder or thereunder, in breach of any license, sublicense or other agreement relating to the Intellectual Property or Third Party Intellectual Property Rights.

(e) All patents, registered trademarks, service marks and copyrights held by Target or any of its Subsidiaries are valid and subsisting. Neither Target nor any of its Subsidiaries (i) has been sued or named in any suit, action or proceeding which involves a claim of infringement of any patent, trademark, service mark or copyright or violation of any trade secret or other proprietary right of any third party, (ii) has knowledge that the manufacturing, marketing, licensing or sale of its products infringes any patent, trademark, service mark, copyright, trade secret or other proprietary right of any third

-10-

party or (iii) has brought any action, suit or proceeding for infringement of Intellectual Property or breach of any license or agreement involving Intellectual Property against any third party.

(f) Target and each of its Subsidiaries has secured valid written assignments from all consultants and employees who contributed to the creation or development of Intellectual Property of any and all the rights to such contributions that Target does not already own by operation of law.

(g) Target and each of its Subsidiaries has taken all necessary and appropriate steps to protect and preserve the confidentiality of all Intellectual Property not otherwise protected by patents, patent applications or copyright (" *Confidential Information* "). All use, disclosure or appropriation of Confidential Information owned by Target or any of its Subsidiaries by or to a third party has been pursuant to the terms of a written agreement between Target or its Subsidiaries, on the one hand, and such third party, on the other hand. All use, disclosure or appropriation of Confidential Information not owned by Target or its Subsidiaries has been pursuant to the terms of a written agreement between Target or the applicable Subsidiary, on the one hand, and the owner of such Confidential Information, on the other hand, or is otherwise lawful.

2.10 **Interested Party Transactions** . Except as set forth on <u>Schedule 2.10</u> of the Disclosure Schedule, neither Target nor any of its Subsidiaries is indebted to any director, officer, employee or agent of Target or any of its Subsidiaries (except for amounts due as normal salaries and bonuses and in reimbursement of ordinary expenses, in each case in the ordinary course of business consistent with past practice), and no such person is indebted to Target or any of its Subsidiaries.

2.11 **Taxes** . Target and each of its Subsidiaries has properly completed and timely filed all Tax Returns required to be filed by Target or such Subsidiaries and has paid all Taxes shown thereon to be due. Target and each of its Subsidiaries has provided adequate accruals in accordance with GAAP in its Financial Statements for any Taxes that have not been paid, whether or not shown as being due on any Tax Returns. There is (i) no material claim for Taxes that is a lien against the property of Target or any of its Subsidiaries or is being asserted against Target or any of its Subsidiaries other than liens for current Taxes not yet due and payable and (ii) no audit of any Tax Return of Target or any of its Subsidiaries being conducted by a Tax Authority. Neither Target nor any of its Subsidiaries is a party to any tax sharing or tax allocation agreement nor does Target or any of its Subsidiaries owe any amount under any such agreement. Target and each of its Subsidiaries is in full compliance with all terms and conditions of any Tax exemptions or other Tax-sparing agreement or order of any foreign government and the consummation of the transactions contemplated hereby and by the Ancillary Agreements will not have any adverse effect on the continued validity and effectiveness of any such Tax exemptions or other Tax-sparing agreement or order. Target and each of its Subsidiaries has in its possession receipts for all Taxes paid to Tax Authorities.

-11-

2.12 **Employment Matters** .

(a) Schedule 2.12 of the Disclosure Schedule lists all the employees of Target and each of its Subsidiaries and, with respect to each, his/her date of hire, position, duties, salary and all major employment benefits. No salary, pension or other major employment benefits have been granted to any such person on terms or conditions which are more favorable than those indicated in Schedule 2.12 of the Disclosure Schedule. Neither Target nor any of its Subsidiaries has any employee benefit plans, programs, policies or agreements, including but not limited to any pension plans, multiemployer plans or 401(k) plans.

(b) No payments have been made or authorized by Target or any of its Subsidiaries to their respective employees, officers or directors not dealing at arm's length. Neither Target nor any of its Subsidiaries has entered into any agreement, undertaking or commitment with any of the foregoing which is not made in the ordinary course of business, which is not consistent with past practice or which is not normal and usual in the trade.

(c) Target and each of its Subsidiaries is in compliance with all laws, regulations, agreements and other commitments of Target or such Subsidiary, as applicable, with respect to employment practice terms and conditions of employment. Neither Target nor any of its Subsidiaries is liable for any damages to any employee, officer or director of Target or such Subsidiary resulting from the violation of any applicable employment law or agreement.

(d) Except as set forth on Schedule 2.12(d) of the Disclosure Schedule, there are no outstanding, pending or, to the knowledge of Target, threatened: (i) claims, disputes or other controversies between Target or any of its Subsidiaries and any of their respective employees, officers and directors or (ii) unfair labor practice complaints or other complaint or grievances against Target or any of its Subsidiaries by such persons.

2.13 **Certain Agreements Affected by the Purchase** . Except as set forth on Schedule 2.13 of the Disclosure Schedule, neither the execution and delivery of this Agreement and the other Ancillary Agreements by Seller nor the consummation of the transactions contemplated hereby and thereby will (i) result in any payment (including, without limitation, severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any director, officer or employee of Target or any of its Subsidiaries, (ii) materially increase any benefits otherwise payable by Target or any of its Subsidiaries or (iii) result in the acceleration of the time of payment or vesting of any such benefits. No payment or benefit which will or may be made by Target or any of its Subsidiaries to any employee will be characterized as an " *excess parachute payment* " within the meaning of Section 280G(b)(1) of the Internal Revenue Code of 1986, as amended.

2.14 **Insurance** . Target and its Subsidiaries have the policies of insurance and bonds listed on Schedule 2.14 of the Disclosure Schedule. There is no material claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters or issuers of such policies or bonds. All premiums due and payable under all

-12-

such policies and bonds have been timely paid and Target and each of its Subsidiaries, as applicable, is otherwise in compliance with the terms of such policies and bonds. Target has no knowledge of any threatened termination of, or material premium increase with respect to, any of such policies.

2.15 **Litigation** . Except as set forth on Schedule 2.15 of the Disclosure Schedule, there is no private or governmental action, suit, proceeding, claim, arbitration or investigation pending before any agency, court or tribunal, foreign or domestic, or, to the knowledge of the Seller, threatened against Target or any of its Subsidiaries (whether instituted by or on behalf of any customer, employee, vendor, reseller of Target or any of its Subsidiaries or any other Person), or any of their respective properties or their respective officers or directors (in their capacities as such). There is no judgment, decree or order against Target, and of its Subsidiaries or any of their respective properties or directors or officers (in their capacities as such) or any of Target's or its Subsidiaries' customers, that could prevent, enjoin or materially alter or delay any of the transactions contemplated by this Agreement or any Ancillary Agreement, or that could reasonably be expected to have a Material Adverse Effect on Target. Schedule 2.15 of the Disclosure Schedule lists and describes in reasonable detail all litigation, proceedings and investigations that Target or any of its Subsidiaries has instituted or that are pending against or with respect to any other person or entity.

2.16 **Material Contracts** . Except for the material contracts identified and described in Schedule 2.16 of the Disclosure Schedule (collectively, the " *Material Contracts* "), neither Target nor any of its Subsidiaries is a party to or bound by any material contract, including, without limitation:

(a) any agreement presently in effect relating to the sale of any securities, assets or business, by merger or otherwise;

(b) any trust indenture, mortgage, promissory note, loan agreement or other contract for the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction of the type required to be capitalized in accordance with GAAP;

(c) any contract with any person with whom Target does not deal at arm's length;

(d) any contract limiting the freedom of Target to engage in any line of business or to compete with any other Person or any confidentiality, secrecy or non-disclosure contract;

(e) any distributor, sales, advertising, agency or publishing contract;

(f) any contract that expires, or may be renewed at the option of any person other than Target so as to expire, more than one year after the date of this Agreement;

-13-

(g) any continuing contract for the purchase of materials, supplies, equipment or services involving, in the case of any such contract, more than $50,000 over the life of the contract;

(h) any contract for capital expenditures in excess of $50,000 in the aggregate;

(i) any contract pursuant to which Target is a lessor of any machinery, equipment, motor vehicles, office furniture, fixtures or other personal property;

(j) any agreement of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the obligations, liabilities (whether accrued, absolute, contingent or otherwise) or indebtedness of any other person or entity;

(k) any agreement to pay, discharge, settle or otherwise satisfy in an amount in the excess of $50,000 in any one case or $100,000 in the aggregate, any claim asserted or threatened against Target;

(l) any amendment, modification, or supplement to any of the foregoing; or

(m) any agreement to do, cause or permit any of the foregoing.

2.17 **No Breach of Material Contracts** . Target and each of its Subsidiaries has performed all of the obligations required to be performed by it, and is entitled to all benefits, under each of the Material Contracts and, to the best knowledge of Target, neither Target nor any of its Subsidiaries is alleged to be in default under or in respect of any Material Contract. Each of the Material Contracts is in full force and effect and has not been amended (except as indicated on Schedule 2.16 ), and there exists no material default or event of default or event, occurrence, condition or act, with respect to Target or any of its Subsidiaries or, to the best knowledge of Target, with respect to any other party thereto, which, with the giving of notice, the lapse of the time or both, or the happening of any other event or condition, would become a material default or event of default under any Material Contract. True, correct and complete copies of all Material Contracts have been delivered to Acquiror.

2.18 **Restrictions on Business Activities** . There is no agreement, judgment, injunction, order or decree binding upon Target, any of its Subsidiaries or any of their respective properties or assets which has or could reasonably be expected to have the effect of prohibiting or impairing any current or future business practice of Target and its Subsidiaries, any acquisition of property by Target or any of its Subsidiaries or the conduct of any business by Target or any of its Subsidiaries as currently conducted or as proposed to be conducted by Target and its Subsidiaries. Except as set forth on Schedule 2.18 , neither Target nor any of its Subsidiaries has entered into any agreement under which Target or any of its Subsidiaries is restricted from selling, licensing or otherwise distributing any of its products to any class of customers, in any geographic area, during any period of time or in any segment of the market.

2.19 **Governmental Authorizations** . Target and each of its Subsidiaries has obtained each governmental consent, license, permit, grant, or other authorization of any Governmental Entity that is required for the operation of the business of Target and its Subsidiaries or the

-14-

holding of any interest in any of their respective assets (the " *Target Authorizations* "). All of such Target Authorizations are in full force and effect.

2.20 **Compliance with Laws** . Target and each of its Subsidiaries has complied with all statutes, laws, and ordinances and all rules and regulations of all Governmental Entities, and is not in violation of and has not received any notice of violation with respect to any statute, law or ordinance or any rule or regulation of any Governmental Entity, with respect to the conduct of its business, or the ownership or operation of its business or use of its assets, except for such violations or failures to comply as could not reasonably be expected to have a Material Adverse Effect on Target.

2.21 **Minute Books** . The minute books of Target made available to Acquiror contain a complete and accurate summary of all meetings of the board of directors and the shareholders of Target and all actions by written consent of the board of directors and the shareholders of Target since the time of incorporation of Target through the date of this Agreement, and reflect all transactions referred to in such minutes or consents accurately in all material respects.

2.22 **Brokers' and Finders' Fees** . Except as set forth on Schedule 2.22 of the Disclosure Schedule, neither Target nor any of its Subsidiaries has incurred, nor will Target or any of its Subsidiaries (or Acquiror) incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or investment bankers' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

2.23 **Environmental Matters** .

(a) Hazardous Material . Except as would not be reasonably likely to result in a Material Adverse Effect on Target, Seller is not aware of any underground storage tanks or any amount of any substance that has been designated by any Governmental Entity or by applicable federal, state or local law to be radioactive, toxic, hazardous or otherwise a danger to health or the environment, including PCBs, asbestos, petroleum, toxic mold, urea-formaldehyde and all substances listed as hazardous substances pursuant to the Comprehensive Environmental Response, compensation, and Liability Act of 1980, as amended, or defined as a hazardous waste pursuant to the United States Resource Conservation and Recovery Act of 1976, as amended, and the regulations promulgated pursuant to said laws, but excluding office and janitorial supplies (a " Hazardous Material "), that are present, as a result of the actions of Target or any Affiliate of Target, on any of the properties owned or leased by Target as of the date hereof, including the land and the improvements, ground water and surface water thereof.

(b) Hazardous Materials Activities. To the Seller's knowledge, neither Target nor any of its Affiliates has transported, stored, used, manufactured, disposed of, released, removed or exposed its employees or others to Hazardous Materials or manufactured any product containing a hazardous Material in violation of any applicable law.

2.24 **Representations Complete** .None of the representations or warranties made by Seller herein, in any Ancillary Agreement or in any schedule hereto, or any certificate or other document furnished by Seller pursuant to this Agreement, contains or will contain, at the date

-15-

hereof or at the Closing Date, any untrue statement of a material fact, or omits or will omit, at the date hereof or at the Closing Date, to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF ACQUIROR

Acquiror represent and warrant to Seller as follows:

3.1 **Organization, Standing and Power**. Acquiror is a corporation duly organized and validly existing under the laws of its jurisdiction of organization. Acquiror has the corporate power to own its properties and to carry on its business as now being conducted and as proposed to be conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would have a material adverse effect on Acquiror. Acquiror is not in violation of any of the provisions of its Certificate of Incorporation or Bylaws.

3.2 **Authority; No Violations and No Consents**.

(a) Acquiror has all requisite corporate power and authority to enter into this Agreement and each of the Ancillary Agreement to which Acquiror is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which Acquiror is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Acquiror.

(b) This Agreement and each of the Ancillary Agreements to which it is a party have been duly executed and delivered by Acquiror and constitute the legal, valid and binding obligations of Acquiror, enforceable against it in accordance with their respective terms. The execution and delivery of this Agreement and each of the Ancillary Agreements to which it is a party by Acquiror does not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under (i) any provision of its Certificate of Incorporation or Bylaws or (ii) any material mortgage, indenture, lease, contract or other agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Acquiror or any of its properties or assets.

(c) No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Acquiror or in connection with the execution and delivery of this Agreement or any other Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby,

-16-

except for such consents, authorizations, filings, approvals and registrations which, if not obtained or made, would not have a material adverse effect on Acquiror and would not prevent, or materially alter or delay, any of the transactions contemplated by this Agreement or any of the Ancillary Agreements.

3.3 **Purchase Entirely for Own Account** . Acquiror understands that a purchase of the Shares involves substantial risks. Acquiror is experienced in evaluating and participating in private placement transactions of securities of companies in a similar stage of development to that of Target and acknowledges that Acquiror is able to fend for itself. Acquiror has such knowledge and experience in financial and business matters that Acquiror is capable of evaluating the merits and risks of the purchase of the Shares. Acquiror can bear the economic risk of Acquiror's purchase of the Shares and is able, without impairing Acquiror's financial condition, to hold the Shares for an indefinite period of time.

3.4 **Brokers' and Finders' Fees** . Acquiror has not incurred, nor will Acquiror incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or investment bankers' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

3.5 **Investment Experience; Economic Risk** . This Agreement is made with Acquiror in reliance upon Acquiror's representation to Seller, which by Acquiror's execution of this Agreement Acquiror hereby confirms, that the Shares will be acquired for Acquiror's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Acquiror has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Acquiror further represents that Acquiror does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to any of the Shares. Acquiror will not sell or otherwise dispose of the Shares (whether pursuant to a liquidating dividend or otherwise) without registration under the Securities Act of 1933, as amended (the " *Securities Act* "), or an exemption therefrom, and the certificate or certificates representing the Shares may contain a legend to the foregoing effect. Acquiror understands that it may not sell or otherwise dispose of the Shares in the absence of either a registration statement under the Securities Act or an exemption from the registration provisions of the Securities Act.

3.6 **Disclosure of Information** . Seller has made available all information requested by Acquiror and Acquiror has received all the information Acquiror considers necessary or appropriate for deciding whether to purchase the Shares. Acquiror has had an opportunity to ask questions and receive answers from Seller regarding the terms and conditions of the sale of the Shares and the Target's business, financial condition, properties and prospects and to obtain additional information (to the extent Seller or Target possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to Acquiror or to which Acquiror had access.

3.7 **No Other Representations** . Acquiror is not relying on Seller or the references to any legal or other opinion in the materials reviewed by Acquiror with respect to the tax considerations of Acquiror relating to its purchase of the Shares. Acquiror has relied solely on the representations, warranties, covenants and agreements contained in this Agreement and the

-17-

Ancillary Agreements (including the Exhibits and Schedules thereto), or its independent investigation in making its decision to acquire the Shares.

3.8 **Tax Liability**. Acquiror has reviewed with its own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement. Acquiror relies solely on such advisors and not on any statements or representations of Seller, Seller's counsel, or any of Seller's agents. Acquiror understands that it (and not Seller) shall be responsible for its own tax liability that may arise as a result of the purchase of the Shares or the transactions contemplated by this Agreement.

## ARTICLE IV
### ADDITIONAL AGREEMENTS

4.1 **Public Disclosure** . Unless otherwise permitted by this Agreement, Acquiror and Seller shall consult with each other before issuing any press release or otherwise making any public statement or making any other public (or non-confidential) disclosure (whether or not in response to an inquiry) regarding the terms of this Agreement and the transactions contemplated hereby, and Acquiror shall not issue any such press release or make any such statement or disclosure without the prior approval of Seller (which approval shall not be unreasonably withheld or delayed), except as may be required by law.

4.2 **Consents; Cooperation** . Acquiror and Seller shall promptly apply for or otherwise seek, and use its best efforts to obtain, all consents and approvals required to be obtained by it for the consummation of the transactions contemplated hereby and shall use commercially reasonable efforts to obtain all necessary consents, waivers and approvals under any of its material contracts in connection with the transactions contemplated hereby for the assignment thereof or otherwise. The parties hereto will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the foregoing. Acquiror and Seller shall use all commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement. In connection therewith, if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as violative of any applicable law or agreement, each of parties hereto shall cooperate and use all commercially reasonable efforts vigorously to contest and resist any such action or proceeding and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent (each an " *Order* "), that is in effect and that prohibits, prevents, or restricts consummation of the Acquisition or any such other transactions, unless by mutual agreement the parties hereto decide that litigation is not in their respective best interests. The parties hereto shall use all commercially reasonable efforts to take such action as may be required to cause the expiration of all applicable waiting or notice periods under any and all applicable laws with respect to such transactions as promptly as possible after the execution of this Agreement.

-18-

4.3 **Best Efforts and Further Assurances** . Each of the parties to this Agreement shall use such party's best efforts to effectuate the transactions contemplated hereby and to fulfill and cause to be fulfilled the conditions to closing under this Agreement. Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

4.4 **Legal Requirements** . Each of the parties hereto will take all reasonable actions necessary to comply promptly with all legal requirements which may be imposed on them with respect to the consummation of the transactions contemplated by this Agreement and will promptly cooperate with and furnish information to any party hereto necessary in connection with any such requirements imposed upon such other party in connection with the consummation of the transactions contemplated by this Agreement and will take all reasonable actions necessary to obtain (and will cooperate with the other parties hereto in obtaining) any consent, approval, order or authorization of, or any registration, declaration or filing with, any Governmental Entity or other person, required to be obtained or made in connection with the taking of any action contemplated by this Agreement.

4.5 **Employees** . Acquiror shall have no obligation to make any offer of employment to or otherwise engage or continue to employ any person employed by Target.

## ARTICLE V
## CONDITIONS PRECEDENT

5.1 **Conditions to Obligations of Each Party** . The respective obligations of each party to this Agreement to consummate and effect the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived, in writing, by agreement of all the parties hereto (to the extent permitted by law):

(a) **No Injunctions or Restraints; Illegality** . No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the sale of the Shares hereunder shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending; nor shall there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the sale of the Shares hereunder, which makes the consummation of the sale of the Shares hereunder illegal. In the event an injunction or other order shall have been issued, each party agrees to use its reasonable efforts to have such injunction or other order lifted;

-19-

(b) **Governmental Approval** . Acquiror and Seller shall have timely obtained from each Governmental Entity all approvals, waivers and consents, if any, necessary for consummation of or required in connection with the transactions contemplated hereby.

5.2 **Additional Conditions to Obligations of Seller and Target** . The obligations of Seller to consummate and effect the transactions contemplated hereby shall be subject to the Acquiror having fully performed and complied in all material respects with all covenants, obligations and conditions set forth in this Agreement and required to be performed or complied with by it at or prior to the Closing.

5.3 **Additional Conditions to the Obligations of Acquiror** . The obligations of Acquiror to consummate and effect the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived, in writing, by Acquiror:

(a) **Representations, Warranties and Covenants** . (i) The representations and warranties of Seller in this Agreement shall be true and correct in all material respects (except that those representations and warranties that are qualified by their terms as to materiality shall be true and correct in all respects) on and as of the Closing Date as though such representations and warranties were made on and as of such time and (ii) Seller shall have performed and complied in all material respects with all covenants, obligations and conditions set forth in this Agreement and required to be performed or complied with by it at or prior to the Closing;

(b) **No Proceedings** . No proceeding shall have been brought before any administrative agency or commission, court or competent jurisdiction or other governmental authority or instrumentality, domestic or foreign, seeking to limit or restrict (i) the conduct or operation of the business of Target or (ii) the use of its Intellectual Property;

(c) **Third Party Consents** . Acquiror shall have been furnished with evidence of the consent or approval of those persons whose consent or approval, if any, shall be necessary for the consummation of or required in connection with the transactions contemplated hereby; and

(d) **Resignation of Directors** . The directors of Target in office immediately prior to the Closing shall have tendered their resignations as directors of Target effective as of or prior to the Closing Date.

-20-

**ARTICLE VI**
**INDEMNIFICATION**

6.1 <u>Survival of Representations and Warranties</u>. The Seller's representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall terminate on the second anniversary of the Closing Date (the " *Escrow Termination Date* "); provided , however , that (i) the representations and warranties relating to capitalization and title to the Shares set forth in <u>Section 2.3</u> shall survive the date hereof and continue until the seventh anniversary of the Closing Date; (ii) the representations and warranties relating to Intellectual Property set forth in <u>Section 2.9</u> shall survive the date hereof and continue until the third anniversary of the Closing Date; (iii) the representations, warranties and covenants relating or pertaining to any Tax set forth in <u>Section 2.11</u> hereof shall survive until the expiration of all applicable statutes of limitations, or extensions thereof, governing such Tax; and (iv) if any claims for indemnification have been asserted with respect to any such representations and warranties prior to the Escrow Termination Date, the representations and warranties on which such claims are based shall continue in effect solely with respect to such claims until final resolution of such claims.

6.2 <u>Indemnification by Seller.</u>

(a) Subject to the limitations set forth in <u>Section 6.1</u> above and <u>Section 6.2(b)</u> below, Seller shall indemnify, defend and hold harmless Acquiror, and its employees, officers, directors and shareholders and Affiliates (including Target after the Closing Date) (hereinafter referred to individually as an " *Acquiror Indemnified Person* " and collectively as " *Acquiror Indemnified Persons* ") from and against any and all losses, costs, damages, liabilities, expenses (including, without limitation, reasonable legal fees and expenses of investigation and defense), claims, demands, actions, judgments and causes of action (hereinafter individually, a " *Loss* " and collectively " *Losses* ") resulting, directly or indirectly, from or in connection with (i) any misrepresentation, or falsity, breach or inaccuracy, or default of or in connection with any of the representations, warranties, covenants and agreements given or made by Seller in this Agreement, the Ancillary Agreements or any instrument delivered by Seller pursuant hereto or thereto, (ii) without limiting the generality of the preceding clause (i), any Losses incurred by Target in connection with any of the pending claims set forth in <u>Schedule 8.2(a)</u> of the Disclosure Schedule (which schedule shall include or cross-reference the claims and disputes set forth on <u>Schedule 2.12(d)</u> and <u>Schedule 2.15</u> of the Disclosure Schedule) (the " *Pending Claims* "), (iii) any Losses incurred by Target after the Closing Date but prior to the Escrow Termination Date arising solely as the direct result of any intentional or grossly negligent act or omission by Seller or Target that occurred prior to the Closing Date, or (iv) any claims for broker's or finder's fees arising out of the transactions contemplated hereby.

(b) <u>Limitation on Liability</u> . The maximum liability of Seller under this <u>Section 6.2</u> (including with respect to Pending Claims) shall be limited to $1,400,000 (inclusive of the Escrow Amount); provided , however , that nothing herein shall limit the liability of Seller to the extent a claim is based, in whole or in part, on fraud or intentional

-21-

misrepresentation by the Seller (a " *Fraud Claim* "). Notwithstanding the foregoing, Seller shall not be obligated to indemnify the Acquiror Indemnified Persons pursuant to this Section 6.2 unless and until the amount of all Losses incurred by the Acquiror Indemnified Persons, taken as a group, exceeds $50,000 in the aggregate, in which event Seller shall indemnify the Acquiror Indemnified Persons for all Losses incurred by them in the aggregate from the first dollar of Losses; provided , however , that the limitation set forth in this sentence shall not apply to any Losses arising from a breach of Section 7.2 hereof regarding the payment of all Transaction Expenses incurred by the Seller or Target in connection with the transactions contemplated hereby. Seller shall not have any right of contribution from Target with respect to any Loss claimed by any Acquiror Indemnified Person.

    (c) Indemnification Procedure . Upon receipt by Seller of a certificate signed by any officer of Acquiror (an " *Officer's Certificate* "): (i) stating that Acquiror has paid or properly accrued or reasonably anticipates that it will have to pay or accrue Losses and (ii) specifying in reasonable detail the individual items of Losses included in the amount so stated, the date each such item was paid or properly accrued, or the basis for such anticipated liability, and the nature of the inaccuracy or breach of warranty or covenant to which such item is related, Seller shall have thirty (30) days to object in a written statement to the claim made in the Officer's Certificate, and such statement shall have been delivered to Acquiror prior to the expiration of such thirty (30) day period.

    (d) Resolution of Conflicts; Arbitration .

        (i) In the event that Seller shall object in writing to any claim or claims made in any Officer's Certificate within thirty (30) days after delivery of such Officer's Certificate, the parties shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claims.

        (ii) If no such agreement can be reached after good faith negotiation, either party may demand arbitration of the matter unless the amount of Loss is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration, and in either such event the matter shall be settled by arbitration conducted by one arbitrator mutually agreeable to both parties. In the event that within thirty (30) days after submission of any dispute to arbitration, the parties cannot mutually agree on one arbitrator, Seller and Acquiror shall each select one arbitrator, and the two arbitrators so selected shall select a third arbitrator. The arbitrator or arbitrators, as the case may be, shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator or majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the dispute. The arbitrator or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the extent as a competent court of law or equity, should the arbitrators or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification. The decision of the arbitrator or a majority of the three arbitrators, as the case may be, as to the

-22-

validity and amount of any claim in such Officer's Certificate shall be binding and conclusive upon the parties to this Agreement. Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s). Notwithstanding anything in this Section 6.2(d) to the contrary, the Escrow Agent shall be entitled to act in accordance with such decision and make or withhold payments from the Escrow Fund in accordance therewith.

(iii) Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any such arbitration shall be held in either Washington, DC or Houston, Texas, under the rules then in effect of the American Arbitration Association for commercial disputes. For purposes of this Section 6.2(d), in any arbitration hereunder in which any claim or the amount thereof stated in the Officer's Certificate is at issue, Acquiror shall be deemed to be the nonprevailing party in the event that the arbitrators award less than the sum of one-half of the disputed amount plus any amounts not in dispute. The nonprevailing party to an arbitration shall pay its own expenses, the fees of each arbitrator, the administrative costs of the arbitration and the expenses, including, without limitation, the reasonable attorneys' fees and costs, incurred by the other party to the arbitration.

(e) Third-Party Claims.

(i) If any third party shall notify Acquiror with respect to any matter (hereinafter referred to as a "*Third Party Claim*"), which may result in Losses, then Acquiror shall give prompt notice to Seller (and in any event within thirty (30) days) of Acquiror becoming aware of any such Third Party Claim or of facts upon which any such Third Party Claim will be based setting forth such material information with respect to the Third Party Claim as is reasonably available to Acquiror; provided, however, that no delay or failure on the part of Acquiror in notifying Seller shall relieve Seller from any obligation hereunder unless Seller is thereby materially prejudiced (and then solely to the extent of such prejudice). The Seller shall not be liable for any attorneys fees or expenses incurred by any Acquiror Indemnified Person prior to Acquiror and its officers, directors and affiliates giving notice to Seller of a Third Party Claim.

(ii) In case any Third Party Claim is asserted against Acquiror, and Acquiror notifies Seller thereof pursuant to Section 6.2(e)(i) above, Seller will be entitled, if it so elects by written notice delivered to Acquiror within thirty (30) days after receiving Acquiror's notice, to assume the sole defense thereof, at the expense of Seller (independent of the Escrow Fund); provided, that (A) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief and (B) counsel selected by Seller is reasonably acceptable to Acquiror. If Seller so assumes any such defense, Seller shall conduct the defense of the Third Party Claim actively and diligently. The Seller shall not compromise or settle such Third Party Claim or consent to entry of any judgment in respect thereof without the prior written consent of Acquiror (which shall not be unreasonably withheld or delayed).

(iii) In the event that Seller assumes the defense of the Third Party Claim in accordance with Section 6.2(e)(ii) above, Acquiror may retain separate outside legal counsel and participate in the defense of the Third Party Claim, but the fees and expenses of such outside legal counsel shall be at the expense of Acquiror. Each Acquiror Indemnified Person will

-23-

cooperate in Seller's defense of the Third Party Claim and will provide full access to documents, assets, properties, books and records reasonably requested by Seller and material to the claim and will make available all officers, directors and employees reasonably requested by Seller for investigation, depositions and trial.

(iv) In the event that Seller fails or elects not to assume the defense of Acquiror against such Third Party Claim, which Seller had the right to assume under Section 6.2(e)(ii) above, (a) Acquiror shall have the right to undertake the defense, (b) no Acquiror Indemnified Person shall compromise or settle such Third Party Claim or consent to entry of any judgment in respect thereof without the prior written consent of Seller (which shall not be unreasonably withheld or delayed) and (c) Seller may retain separate outside legal counsel and participate in the defense of the Third Party Claim, but the fees and expenses of such outside legal counsel shall be at the expense of Seller. In the event that Seller is not entitled to assume the defense of the Acquiror Indemnified Persons against such Third Party Claim pursuant to Section 6.2(e)(ii) above, Acquiror shall have the right to undertake the defense; provided, however, that no Acquiror Indemnified Person shall consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the written consent of Seller (which shall not be unreasonably withheld or delayed). In each case, Acquiror shall conduct the defense of the Third Party Claim actively and diligently, and Seller will cooperate with Acquiror in the defense of that claim and will provide full access to documents, assets, properties, books and records reasonably requested by Acquiror and material to the claim and will make available all individuals reasonably requested by Acquiror for investigation, depositions and trial.

6.3 **Indemnification by Acquiror** . Prior to the Escrow Termination Date, Acquiror (and, after the Closing, Target, jointly and severally) shall indemnify, defend and hold harmless Seller and its employees, officers, directors and shareholders (hereinafter referred to individually as an " *Seller Indemnified Person* " and collectively as " *Seller Indemnified Persons* ") from and against any and all losses, costs, damages, liabilities, expenses (including, without limitation, reasonable legal fees), claims, demands, actions, judgments and causes of action resulting, directly or indirectly, from or in connection with any claim, action, suit or investigation brought against Seller and arising from or related to the conduct of the business of Target or Acquiror after the Closing.

**ARTICLE VII**
**GENERAL PROVISIONS**

7.1 **Notices** . All notices and other communications required or permitted hereunder shall be in writing and shall be given and will be deemed received (i) if delivered personally, when so delivered, (ii) if delivered by reputable overnight delivery service, one business day after being deposited with such service, (iii) if mailed (postage prepaid) by registered or certified mail (return receipt requested), three business days after being so mailed or (iv) if sent via facsimile upon confirmation of receipt, to the parties at the following address (or at such other address as a party as shall specify by notice):

-24-

(a) if to Acquiror, to:
The Resource Group International Limited
1700 Pennsylvania Avenue NW, Suite 560
Washington, DC 20006
Attn: Hasnain Aslam
Phone: (202) 289-9898
Fax: (202) 289-8088
with a copy to:
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, NW
Washington, DC 20007
Attn: Mark W. Seneca
Phone: (202) 339-8565
Fax: (202) 339-8500
(b) if to Seller to:
INX Inc.
6401 Southwest Freeway
Houston, Texas 77074
Attn: James H. Long, Chairman and Chief Executive Officer
Phone: 713-795-2000
Fax: 713-795-2001
with a copy to:
Mayer, Brown, Rowe & Maw LLP
700 Louisiana Street
Suite 3600
Houston, Texas 77002
Attn: Robert F. Gray, Jr.
Phone: 713-221-1651
Fax: 713-632-1867

7.2 **Expenses** . Whether or not the transactions contemplated by this Agreement are consummated, all fees and expenses incurred by the Seller or Target in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, including, without limitation, all legal, accounting, financial, advisory, consulting and all other fees and expenses of third parties engaged by the Seller or Target (collectively, the " *Transaction Expenses* ") shall be borne by the Seller and shall not be the responsibility of Acquiror or Target.

7.3 **Remedies** . Seller agrees that, in addition to all other remedies to which Acquiror is entitled, Acquiror shall have the right to enforce the terms of this Agreement by a decree of

-25-

specific performance, provided Acquiror is not in material default hereunder. Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

7.4 **Assignment**. This Agreement shall not be assigned by operation of law or otherwise except by merger of Acquiror with and into another person or entity, by transfer by Acquiror to any affiliate or as otherwise specifically provided herein. No assignment of this Agreement will relieve the non-assigning parties of their obligations, responsibilities or liabilities hereunder.

7.5 **Amendment; Waiver**. This Agreement may not be amended, modified, supplemented or terminated nor shall any waiver be effected except by a writing executed by Acquiror and Seller. No failure or delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof. In addition, no waiver on the part of any party of any right, power or privilege hereunder shall operate as a waiver of any other right, power or privilege.

7.6 **Entire Agreement**. This Agreement and the documents and instruments and other agreements specifically referred to herein or delivered pursuant hereto, including the exhibits and schedules hereto, constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

7.7 **Parties in Interest**. This Agreement is binding upon and is for the benefit of the parties hereto. This Agreement is not made for the benefit of any person not a party hereto, and no other person will acquire or have any benefit, right, remedy or claim under or by reason of this Agreement.

7.8 **Headings**. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

7.9 **Adverse Construction**. The parties hereto agree that they have been represented by counsel during the negotiation, preparation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

7.10 **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF TEXAS WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICT OF LAWS.

7.11 **Consent to Jurisdiction; Service of Process**. Acquiror and Seller hereby irrevocably submit to the exclusive jurisdiction of the federal courts of the United states of America located in Houston, Texas or the courts of the State of Texas located in the City of

-26-

Houston for the purposes of any action, suit or proceeding arising out of or relating to this Agreement, any Ancillary Agreement or any transaction contemplated hereby or thereby (any agrees not to commence any action relating hereto or thereto except in such courts). Each party agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim it may now or hereafter have that it is not subject personally to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such courts. Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any party if given personally or by registered or certified mail, postage prepaid and return receipt requested, or by personal service on such party.

   7.12 **Severability** . In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.

   7.13 **Counterparts** . This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument, each of which may be delivered via facsimile.

## ARTICLE VIII
## DEFINITIONS

   For the purposes of this Agreement, the following terms shall have the following meanings:

   " *Accounts Receivable* " shall mean the accounts receivable of Target, net of reserves, as reflected on the Financial Statements or on the books and records of Target as of the Closing Date.

   " *Affiliate* " shall mean, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person.

   " *Business Day* " means any day except a Saturday, Sunday or a day on which banking institutions in the State of Texas are obligated or permitted by law, regulation or governmental order to close.

   *"Current Assets"* means, as of any date of determination, all amounts that should, in accordance with GAAP, be included as current assets on the consolidated balance sheet of Target as of such date, including without limitation all cash, cash equivalents, marketable securities, Accounts Receivable, Notes Receivable and pre-paid expenses of Target, but shall not include federal, state and local income Taxes receivable (including the current portion of deferred Taxes) and intercompany receivables from any Affiliate of Target.

-27-



"*Current Liabilities*" means, as of any date of determination, all amounts that should, in accordance with GAAP, be included as current liabilities on the consolidated balance sheet of Target, as of such date.

"*GAAP*" shall mean United States generally accepted accounting principles, as in effect from time to time.

"*knowledge*" means (i) with respect to any natural person, the actual knowledge, after due and diligent inquiry, of such person or (ii) with respect to any corporation or other entity, the actual knowledge of such party's officers, directors and other managers (and in the case of Target, the actual knowledge of Seller's officers and directors), provided that such persons shall have made due and diligent inquiry of those employees of such party whom such officers, directors and managers reasonably believe would have actual knowledge of the matters represented.

"*material*" with respect to any entity or group of entities means any event, change, condition or effect related to the condition (financial or otherwise), properties, assets (including intangible assets), liabilities, business, operations, results of operations or prospects of such entity and its subsidiaries, taken as a whole.

"*Material Adverse Effect*" shall mean any event, change or effect that is materially adverse to the current business, financial condition or assets of the Target and its Subsidiaries taken as a whole.

"*Notes Receivable*" shall mean the notes receivable of Target from customers in connection with fixed payment plans agreed between Target and such customers as reflected on the Financial Statements or on the books and records of Target as of the Closing Date.

"*Person*" shall mean any individual, corporation, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, Governmental Authority or other entity or organization.

"Subsidiary" shall mean any Person, whether or not existing on the date hereof, in which Target directly or indirectly through subsidiaries or otherwise, beneficially owns at least fifty percent (50%) of either the equity interest or voting power of or in such Person.

"*Tax*" (and, with correlative meaning, "*Taxes*" and "*Taxable*") means (i) any net income, gross income, gross receipts, sales, use, ad valorem, transfer, profits, license, withholding, payroll, employment, excise, severance, stamp, premium, property, or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental entity (a "*Tax Authority*") responsible for the imposition of any such tax (domestic or foreign), (ii) any liability for the payment of any amounts of the type described in <u>Section 2.11(i)</u> as a result of being a member of an affiliated, consolidated, combined or unitary group for any Taxable period and (iii) any liability for the payment of any amounts of the type described in <u>Sections 2.11(i)</u> and <u>(ii)</u> as a result of any express or implied obligation to indemnify any other person or as a result of being a successor or transferee of any person.

-28-

" *Tax Return* " shall mean any return, statement, report or form (including, without limitation, estimated Tax Returns and reports, withholding Tax Returns and reports and information reports and returns) required to be filed with respect to Taxes.

" *Working Capital* " means Current Assets as of 12:01 a.m. on the Closing Date *less* Current Liabilities as of 12:01 a.m. on the Closing Date, as reflected on the Closing Date Working Capital Statement or the Post-Closing Working Capital Statement, as the case may be.

[SIGNATURE PAGE FOLLOWS]

-29-

IN WITNESS WHEREOF, Seller and Acquiror have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized all as of the date first above written.

THE RESOURCE GROUP
INTERNATIONAL LIMITED

By:      /s/Hasnain Aslam
Name:  Hasnain Aslam
Title:    Executive Vice President

INX INC.

By:      /s/ James H. Long
Name:  James H. Long
Title:    Chairman and Chief Executive
           Officer

-30-

Exhibit 99.1

# PRESS RELEASE

### INX Announces Sale of Stratasoft Subsidiary

HOUSTON—(BUSINESS WIRE)—January 31, 2006—INX Inc., (AMEX:ISR; the "Company" or "INX") today announced the sale of its Stratasoft Inc. ("Stratasoft") subsidiary to The Resource Group International Limited ("TRG").

Commenting on the announcement, James H. Long, Chairman and CEO of INX stated, "We are pleased to conclude this transaction. While we believe Stratasoft is positioned for continued success, we realize that our current strategic direction and Stratasoft's opportunities for growth do not coincide. We believe TRG will capitalize on Stratasoft's strengths and potential for growth. This transaction brings INX one step closer to our goal of becoming an organization focused purely on delivering advanced IP communications solutions to enterprise organizations."

Gregory A. Enders, President and CEO of Stratasoft commented, "The acquisition of Stratasoft by TRG is the ideal ownership structure to accelerate Statasoft's mission to positively change the way the world does business in the Call Center and VoIP marketplaces. There are tremendous synergies and resources within the TRG profile that will facilitate every aspect of Stratasoft's strategic plan."

Zia Chishti, Chief Executive Officer for TRG, commented, "We are pleased to welcome Stratasoft into the TRG family of companies, with its powerful and innovative platform for contact centers, especially the award-winning StrataDial VC2 and a remarkably diverse worldwide installed base. We look forward to bringing additional resources to enhancing Stratasoft's product set, enhancing its position as the industry's premier IP contact center solution. We've seen the transformation taking place in the global contact center industry and feel Stratasoft offers the best solutions enabling in-house and outsource contact centers to operate more efficiently and flexibly." TRG will operate Stratasoft as a wholly owned subsidiary.

Raymond James & Associates, Inc. advised INX on the transaction.

ABOUT INX:

INX Inc. (AMEX:ISR) is a publicly traded network infrastructure professional services firm delivering best-of-class "Business Ready Networks" to enterprise organizations. INX offers a full suite of Advanced Technology solutions that support the entire life-cycle of IP Communications systems. We design, implement, and support the IP network infrastructure for enterprise organizations including routing and switching, IP Telephony, messaging, wireless, network storage and security. Operating in a highly focused manner provides a level of expertise that enables us to better compete in the markets we serve. Our customers for enterprise-level Cisco-centric advanced technology solutions include large enterprises organizations such as corporations, public schools as well as federal, state and local governmental agencies. Because we have significant experience implementing and supporting the critical technology building blocks of IP Telephony systems and other IP Communications advanced technology solutions for enterprises, we believe we are well positioned to deliver superior solutions and services to our customers. Additional information about INX can be found on the Web at www.inxi.com.

ABOUT STRATASOFT:

Stratasoft is an acknowledged technology leader in professional contact center systems. Stratasoft has a comprehensive patent portfolio that includes predictive dialing, predictive dialing algorithms, contact center database management, contact center campaign scripting and contact center management systems. Its product line consists of StrataSIP Web Agent — 2004 Product of the Year award winner from Customer Inter@ction Solutions? , StrataDial.VC2 — Virtual Contact Center, a 2002 Product of the Year award winner from both Customer Inter@ction Solutions and Communications Solutions magazines, and StrataVoice, an Unattended Message Notification System. All of Stratasoft's products incorporate functionality that is 100% customer-driven and are designed to maximize productivity in any contact center application. To learn more about Stratasoft on the Internet visit www.stratasoft.com.

ABOUT TRG:

TRG is a leading global investor and operator of business services companies. TRG provides capital, strategic advice and its operational expertise in the BPO and customer relationship management verticals to the benefit of its portfolio companies worldwide.

SAFE HARBOR STATEMENT:

The statements contained in this document that are not statements of historical fact, including but not limited to, statements identified by the use of terms such as "anticipate," "appear," "believe," "could," "estimate," "expect," "hope," "indicate," "intend," "likely," "may," "might," "plan," "potential," "project," "seek," "should," "will," "would," and other variations or negative expressions of these terms, are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 and involve a number of risks and uncertainties. The actual results of the future events described in the forward-looking statements in this document could differ materially from those stated in the forward-looking statements due to numerous factors, including:

- The industry conditions continuing to evolve as the Company expects.

- The Company's ability to execute its strategy as planned.

- Other risks and uncertainties set forth from time to time in the Company's public statements and it's most recent Annual Report filed with the SEC on Form 10-K/A for the year 2004.

Recipients of this document are cautioned to consider these risks and uncertainties and to not place undue reliance on these forward-looking statements. The Company expressly disclaims any obligation or undertaking to update or revise any forward-looking statement contained herein to reflect any change in the Company's expectations with regard thereto, or any change in events, conditions or circumstances upon which any statement is based.

Cisco and Cisco Systems are registered trademarks of Cisco Systems Inc. in the United States and certain other countries.

CONTACT:

INX Inc.

Brian Fontana, Chief Financial Officer, 713-795-2000

or

PR Financial Marketing LLC

Jim Blackman, 713-256-0369

jimblackman@prfinancialmarketing.com

*"VIA FAX"*

# TABLE OF CONTENTS

APPLICATION FOR WRIT OF POSSESSION     1

MEMORANDUM OF POINTS & AUTHORITIES     3

STATEMENT OF FACTS     3

Equipment Lease Agreement, ["ELA"]     4

GUARANTY OF LEASE     5

UCC FINANCING STATEMENTS     6

DEFAULT     6

ELA SCHEDULE     8

GUARANTIES     9

POSSESSION OF EQUIPMENT     9

EQUIPMENT VALUE     10

PROCEDURE     10

I.    AS PLAINTIFF IS A FINANCE LESSOR AND THE FINANCIAL LEASE AGREEMENT AND SCHEDULE IS A FINANCE LEASE, AND ALL WARRANTIES HAVE BEEN DISCLAIMED BY PLAINTIFF, PLAINTIFF IS NOT RESPONSIBLE FOR ANY MAINTENANCE OR WARRANTY AND ANY DEFECT, MALFUNCTION OR FAILURE TO MEET TERMS OF ANY WARRANTY OF THE EQUIPMENT IS NOT A DEFENSE TO PAYMENT UNDER THE FINANCIAL LEASE AGREEMENT AND SCHEDULES.

i

A.   The Lease at Issue Herein is a Finance Lease as Provided by the Commercial Code, and Therefore As a Matter of Law There are No Warranties of Merchantability or Fitness for a Particular Purpose From Plaintiff

B.   All Warranties Related to the Equipment Have Been Properly and Effectively Disclaimed By Plaintiff In the ELA and Schedules in Accordance with UCC Requirements, and Therefore Even if Plaintiff is Not Viewed as a Finance Lessor There are No Warranties

II.   ACCEPTANCE OF THE EQUIPMENT UNDER A FINANCE LEASE CREATES AN IRREVOCABLE OBLIGATION TO PAY, AND ANY POSSIBLE ATTEMPT AT REJECTION MUST BE SEASONABLY MADE, WHICH DEFENDANTS CLEARLY FAILED TO DO IN THE INSTANT MATTER.

III.   PLAINTIFF REQUESTS THAT THE REQUIREMENT OF AN UNDERTAKING BE WAIVED IN THIS CASE.

IV.   CONCLUSION                                                           17

ii

# TABLE OF AUTHORITIES

1

2

3  *Federal Rules of Civil Procedure Rule 64*                          1

4  *California Code of Civil Procedure, §512.010.*                     1

5  *California Code of Civil Procedure §515.010(b)*                    11

6  *California Code of Civil Procedure §515.020(b)*                     3

7  *California Civil Code §§ 1801-1812.10*                              7

8
   *California Civil Code §§ 2981-2984.4*                              5
9
   *California Commercial Code § 10103(7)*                            14
10
11  *California Commercial Code § 10212*                               12

12  *California Commercial Code § 10214*                               10

13  *California Commercial Code § 10407*                               10

14  *California Commercial Code §§ 10508 through 10522*                14
15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Schneider Rucinski Enterprises | ET. ALL. |

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Sacramento
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

**08 CV 0138 WQH POR**

*"VIA FAX"*

*FILED  JAN 2  PM 4: 22*

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                        and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability — ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander — ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine — **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability — ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle — ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
|  | ☐ 355 Motor Vehicle Product Liability — ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits |  | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury — ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting — ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment — Habeas Corpus: |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations — ☐ 530 General |  |  | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare — ☐ 535 Death Penalty |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment — ☐ 540 Mandamus & Other |  |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other — ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights — ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from another district (specify)

☐ 6   Multidistrict Litigation

☐ 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332
Brief description of cause:
defaulted equipment lease agreement

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ >75,000.00 | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  1-23-08

SIGNATURE OF ATTORNEY OF RECORD     on behalf of Noreen Rucinski

**FOR OFFICE USE ONLY**

RECEIPT #  146791   AMOUNT  $350   1/23/08 BY   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES**
**DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**#  146791    -  BH**

**January 23, 2008**
**16:21:52**

**Civ Fil Non-Pris**
USAO #.: 08CV0138 CIVIL FILING
Judge..: WILLIAM Q HAYES
Amount.:                        $350.00 CK
Check#.: BC# 9658

**Total->    $350.00**

FROM: SCHNEIDER RUCINKSI V. TOUCH
      ASIA OUTSPURCING ET AL
      CIVIL FILING